IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| VON LESTER TAYLOR,<br><br>                    Petitioner,<br><br><br>            vs.<br><br><br>SCOTT CROWTHER, Warden, Utah State Prison,<br><br>                    Defendant. | ORDER AND<br><br>MEMORANDUM DECISION<br><br>GRANTING EVIDENTIARY HEARING<br><br><br>Case No. 2:07-cv-194-TC |

This case involves death-row inmate Von Lester Taylor's petition under 28 U.S.C. § 2254.

Mr. Taylor previously pleaded guilty to the capital murders of Beth Potts and Kaye Tiede.  Now, Mr.

Taylor proffers new evidence and asserts that he is actually innocent of both murders.  Determining that

Mr. Taylor has established the potential to advance his claim of actual innocence, the court grants his

motion for an evidentiary hearing.

## I.  BACKGROUND

A few days before Christmas 1990, two men, Petitioner Von Lester Taylor and Edward

Steven Deli, broke into a remote mountain cabin owned by the Tiede family in Summit County, Utah.

Although members of the family were spending the holidays at the cabin, they had gone to Salt Lake

City for the evening and the cabin was empty.  After breaking in, Mr. Taylor and Mr. Deli spent the

night in the cabin.

The following day, Kaye Tiede, her twenty-year-old daughter Linae Tiede, and her mother Beth Potts, returned to the cabin.  When the women entered the cabin, Mr. Taylor and Mr. Deli shot Kaye and Beth, but they did not shoot Linae.[1]  Both women died of their wounds.

Mr. Taylor and Mr. Deli took Linae outside the cabin where they encountered two other members of the Tiede family who had just arrived: Tricia Tiede (Linae's sister) and Rolf Tiede (Linae's father).  Mr. Taylor shot Rolf twice before he set the cabin on fire.  Then he and Mr. Deli drove away from the cabin in a snowmobile, forcing Linae and Tricia to leave with them.

When they arrived at the Tiedes' car, they abandoned the snowmobile and took the car, keeping Linae and Tricia as hostages.  Soon the police began a high-speed pursuit which ended when Mr. Taylor lost control of the car and crashed.

The police arrested Mr. Taylor and Mr. Deli.  Both men were charged with multiple crimes, including two charges of capital homicide for the murders of Kaye and Beth.  Initially, Mr. Taylor and Mr. Deli pleaded not guilty by reason of insanity, but both men were found legally sane.  Mr. Taylor then pleaded guilty to the two capital-homicide charges and was sentenced to death.  Mr. Deli went to trial and was found guilty of second-degree murder.  He is serving a life sentence with possibility of parole.

After filing a direct appeal and pursuing his post-conviction remedies, with no success,  Mr. Taylor filed an initial petition under 28 U.S.C. § 2254 in 2007, followed by a first amended petition.  In 2012, he filed a second amended petition (Petition) which raises the issues now before the court.  Mr.

---

[1]To avoid confusion, the court refers to the victims by their first names because Linae and Kaye share the same last name.

Taylor asserts twenty-six claims in the Petition, including a claim of actual innocence, a claim of ineffective assistance of counsel, and a claim that his guilty plea was constitutionally defective. (Second Am. Petition, Docket No. 94.)

In 2013, the court granted Mr. Taylor's motion for discovery. (See Docket Nos. 141, 166.) During discovery, he obtained documents and video footage and deposed witnesses.

Mr. Taylor now moves for an evidentiary hearing on seventeen of his twenty-six claims, including his actual-innocence claim. In that claim, Mr. Taylor does not deny that he took part in the shootings at the Tiede cabin, but he contends that he did not fire the bullets that killed Kaye and Beth. Because a successful actual-innocence claim, as explained later, creates a gateway through which a petitioner can litigate his procedurally barred constitutional claims, the court determined that it would first consider whether Mr. Taylor is entitled to an evidentiary hearing on the actual-innocence claim alone.

## II.  LEGAL STANDARD

Mr. Taylor contends that he deserves an evidentiary hearing because he has reliable new evidence showing that he did not fire the shots that killed Beth or Kaye. Accordingly, Mr. Taylor brings this actual-innocence claim to establish a gateway by which he can litigate his procedurally barred constitutional claims. The State responds that even if Mr. Taylor's proffered evidence were true, he would not meet the actual-innocence standard and, consequently, he does not deserve an evidentiary hearing on his claim.

At common law "res judicata did not attach to a court's denial of habeas relief." McCleskey v. Zant, 499 U.S. 467, 479 (1991). Instead, petitioners could seek habeas relief successively. Id.

3

Federal courts tolerated successive petitions, in part, because habeas relief historically performed only the "narrow function of testing either the jurisdiction of the sentencing court or the legality of Executive detention." Schlup v. Delo, 513 U.S. 298, 317 (1995). But the scope of habeas relief later "expanded beyond its original narrow purview to encompass review of constitutional error that had occurred in the proceedings leading to conviction." Id. The broadening of the scope of habeas relief risked bogging down federal courts in repetitious and meritless petitions. This, in combination with the respect for finality of judgements and principles of comity and federalism, motivated Congress to fashion procedural bars to second and subsequent petitions. Id. These same concerns also led the Supreme Court to hold that "a habeas court may not ordinarily reach the merits of successive claims." Id.

Though the Supreme Court held that habeas courts shouldn't ordinarily reach the merits of successive claims, it also stated that habeas corpus's distinct "equitable nature" precludes the "application of strict rules of res judicata." Id. at 319. As a result, a court must adjudicate even successive habeas claims when required by the "ends of justice." Sanders v. United States, 373 U.S. 1, 15–17 (1963). If a habeas petitioner has defaulted a claim of constitutional error, he may excuse the default by establishing that "he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" Schlup, 513 U.S. at 314–15 (citation and internal quotations omitted) (ellipsis in original).

Because this "fundamental miscarriage" exception must be "rare" and applied only in the "extraordinary case," the Supreme Court has tied it to a petitioner's actual innocence. Id. "[I]n rare cases, an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar." Rivas v. Fischer, 687 F.3d 514, 540 (2d Cir. 2012) (citing Schlup,

4

513 U.S. at 315).  The term "[a]ctual innocence means factual innocence, not mere legal insufficiency."

Bousley v. United States, 523 U.S. 614, 623 (1998).  Accordingly, an actual-innocence claim is a

"gateway" through which a habeas petitioner may pass to have his otherwise-barred constitutional

claims heard on the merits.  Schlup, 513 U.S. at 316.

To establish actual innocence, a petitioner bears the burden of establishing that "it is more likely

than not that no reasonable juror would have convicted him in the light of the new evidence."  Id. at

327.  This standard requires courts to determine what "reasonable, properly instructed jurors would

do."  Id. at 329.  And the new evidence must be reliable—"whether it be exculpatory scientific

evidence, trustworthy eyewitness accounts, or critical physical evidence."  Id. at 324.

Because a petitioner's actual-innocence claim must be based on new evidence, district courts

often require evidentiary hearings so they can weigh that evidence.  And district courts have broad

discretion on whether to hold an evidentiary hearing on a petitioner's actual-innocence claim.  Johnson

v. Medina, 547 F. App'x 880, 886 (10th Cir. 2013).  A court should exercise its discretion and hold an

evidentiary hearing if the hearing has "'the potential to advance the petitioner's claim.'"  Lopez v. Miller,

906 F. Supp. 2d 42, 53 (E.D.N.Y. 2012) (quoting Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir.

2000)).  In other words, a court should grant an evidentiary hearing "if it could enable a habeas

applicant to prove his petition's factual allegations, which, if true, would entitle him to federal habeas

relief."  Coleman v. Hardy, 628 F.3d 314, 319–20 (7th Cir. 2010).

In an actual-innocence evidentiary hearing, a court must "must make its determination

concerning a petitioner's innocence in light of all the evidence, including that alleged to have been

illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have

5

been wrongly excluded or to have become available only after the trial." Schlup, 513 U.S. at 328 (citation and internal quotation marks omitted).  At such a hearing, the "Government is not limited to the existing record to rebut any showing that petitioner might make. Rather, on remand, the Government should be permitted to present any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered." Bousley, 523 U.S. at 624.

Here, Mr. Taylor asks this court for an evidentiary hearing on his actual-innocence claim.  Mr. Taylor pleaded guilty to the murders of both Beth and Kaye. As a result, Mr. Taylor need only be found innocent of one of those murders to avoid the procedural bars to his constitutional claims.  Mr. Taylor's constitutional claims are based not on his innocence, but rather on his contention that he was denied "the full panoply of protections afforded to criminal defendants by the Constitution." Schlup, 513 U.S. at 314. Accordingly, Mr. Taylor's "claim of innocence is offered only to bring him within this "narrow class of cases." Id. at 315 (citation and internal quotation marks omitted).

Given Mr. Taylor's proffered evidence, as discussed below, the court determines that an evidentiary hearing on Mr. Taylor's actual-innocence claim is necessary.  Because Mr. Taylor pleaded guilty to the murder of both Beth and Kaye, he must establish only that he is actually innocent of one of those murders to create a gateway through which he may litigate his procedurally barred claims.  Mr. Taylor has sufficiently demonstrated "'the potential to advance'" his actual-innocence claim. Lopez v. Miller, 906 F. Supp. 2d 42, 53 (E.D.N.Y. 2012) (quoting Campbell v. Vaughn, 209 F.3d 280, 287 (3d Cir. 2000)).

### III.  MR. TAYLOR'S PROFFERED EVIDENCE[2]

Before the shooting began, Mr. Deli was holding a .44-caliber handgun and Mr. Taylor was

holding a .38-caliber handgun.  No one disputes that Mr. Taylor fired the first shot from the .38 and hit

Kaye.  Immediately after he shot her, Kaye doubled over, cried "I've been shot," put her hands up to

her chest or shoulder area, and fell to the ground.[3]  A second or two later, Beth was shot in the head.

Although Linae saw Mr. Taylor shoot Kaye, she did not see who fired at Beth because she "was

looking at [her] grandmother. . . . [she] saw her shot and blood spray everywhere." (Tr. of Penalty

Phase Trial ("Penalty Trial Tr.") at 509.)  At that point, Linae turned away and looked at the fireplace

wall.[4]  More shots were fired, and at the end of the shooting commotion Kaye and Beth were lying on

the floor dead.

Kaye had been shot five times.  She was shot twice in the chest, including the shot causing the

fatal wound, referred to as "Gunshot Wound #2."[5]  The bullet that caused Gunshot Wound #2 entered

---

[2]Mr. Taylor proffers a series of declarations, deposition testimony, and video footage of a "48 Hours" television episode.  Of particular relevance to this order are the declarations of Sharon Schnittker, Joseph Offret, and Edward Deli, and the deposition testimony of Sharon Schnittker.

[3]Linae's testimony has been somewhat unclear on this point.  She has described that moment, either verbally or by gestures, indicating alternatively that Kaye grabbed her left shoulder area, her chest and shoulder area, or her chest.  The exact location of Kaye's physical response is relevant to one of Mr. Taylor's theories, but the court need not address the uncertainty now.

[4]On the day of the murders, Linae reported during an interview that Mr. Taylor was the shooter.  But later, during the preliminary hearing, she was less certain about who fired shots at Beth. (See Prelim. Hrg. Tr. at 17.)  And during the penalty phase trial, she testified under oath that she did not see who fired the shot that killed Beth because she was looking directly at Beth at the time.  And then she turned away.  She heard, but did not see, additional shots being fired.

[5]The medical examiner's numbering of the gunshot wounds bears no relation to the order in which the wounds were inflicted.

the front of Kaye's left shoulder, crossed at a downward angle through Kaye's torso, and exited at the back of Kaye's right shoulder.  In addition, Kaye was shot with bird-shot pellets on her left side, suffered a superficial graze wound on her upper-left arm and had "an irregular superficial abrasion having a similar configuration to that of a nose of a bullet" in the middle upper-chest region.  (Report of Kaye Tiede Autopsy at 6, Ex. 84 to Petition, Docket No. 20-87.)  Other than the pellets, no bullet lodged in her body.

Beth was shot three times: once in the head (the fatal wound), and twice in the chest.  It is undisputed that the head wound was caused by a .44.  All of the bullets went straight through her body.

According to the State's theory of its case, Mr. Taylor killed both women.[6]  The State's case was based largely on forensic evidence and testimony from Dr. Sharon Schnittker (the medical examiner who performed the autopsies), Linae's testimony, and statements made by Mr. Taylor. During the Penalty Trial, Linae testified about the shooting, including a description of where Mr. Taylor and Mr. Deli were standing when Kaye and Beth were shot and which gun each man was holding. According to Linae's description, Mr. Taylor possessed the .38, not the .44 during the crime, at least when Linae was looking at the two men.[7]  (Linae's sister Tricia, who encountered Mr. Taylor and Mr. Deli after the two women had been shot, also associated the .38 with Mr. Taylor and the .44 with Mr.

---

[6]Yet the State independently prosecuted Mr. Taylor's co-defendant Edward Deli for capital murder of both women.

[7]Mr. Taylor points out that Linae never saw him holding the .44.  Although that is true, it is also true that Linae did not see who shot Beth with the .44 because she was looking directly at her grandmother and then she turned to look at the fireplace wall and began to pray.  That particular point in her testimony, on its own, does not rule out the possibility that Mr. Taylor held the .44 while Linae was looking at Beth and then at the fireplace.

Deli.)  At Penalty Trial, Dr. Schnittker opined that the bullet that Mr. Taylor shot from the .38 caused

Gunshot Wound #2 and concluded that Beth's fatal head wound was caused by a .44.  And Mr.

Taylor admitted, during a psychiatric exam, to grabbing the .44 from Mr. Deli and shooting both

women.

After the State filed multiple charges against Mr. Taylor, it held a preliminary hearing.[8]  It also

provided autopsy reports and other documents to Mr. Taylor's attorney, after which Mr. Taylor

pleaded guilty to two counts of capital murder.  The State then presented more extensive evidence to a

jury during the penalty phase trial ("Penalty Trial").[9]

By pleading guilty, Mr. Taylor admitted that he caused the death of Kaye and Beth by firing the

bullets that caused the fatal wounds.  But, according to Mr. Taylor, he entered into his plea agreement

based on his mistaken belief that he fired both fatal shots.  He says he held that mistaken belief because

he only had the State's unquestioned forensic evidence to assess his guilt, evidence that he now

contends is wrong.  In particular, he disputes the State's evidence that the .38 he fired caused Gunshot

Wound #2 and that he fired the .44 that killed Beth.

Mr. Taylor presents new evidence, discussed below, that raises significant concerns about the

State's case against him.  The import of Mr. Taylor's evidence is that he did not fire either of the fatal

---

[8]The preliminary hearing was short and the State presented a limited amount of evidence because the hearing was held approximately two weeks after the men were charged with the crimes. The presiding judge held that the State had established probable cause to detain the men and proceed to trial.

[9]Because Mr. Taylor pleaded guilty, the trial focused on whether to sentence Mr. Taylor to life in prison or death by execution.

shots and so the legitimacy of his guilty plea is undermined.

A.     **The Cause of Kaye's Death**

At the Penalty Trial, Dr. Schnittker opined that Gunshot Wound #2 was caused by the .38 bullet Mr. Taylor fired at Kaye.  She based her opinion largely on the location of a .38 bullet she recovered from the inside of Kaye's sweatshirt—a bullet that had no blood on it.  She described the recovery in her autopsy report: "During removal of the sweatshirt, a projectile is located in the right shoulder region which appears to be adjacent to the exit of gunshot wound #2."  (Report of Autopsy of Kaye Tiede at p. 5, Ex. 84 to Petition, Docket No. 20-87.)  And she testified at the Penalty Trial that "[w]e found a medium caliber projectile in the sweatshirt of the [right] shoulder region . . . [t]hat would be <u>consistent with [Gunshot Wound #2] that we found in the right shoulder</u> during removal of the sweatshirt."  (Penalty Trial Tr. at 708 (emphasis added).)  But no characteristic of Gunshot Wound #2 played a part in Dr. Schnittker's opinion.  Instead, she "assumed that [Gunshot Wound #2] was caused by a .38" based on its proximity to the exit wound, "not because of anything found in [Gunshot Wound #2] itself . . . ."  (2014 Dep. of Sharon Schnittker at 118, Ex. 2 to Mot. Evid. Hr'g, Docket No. 217-3.)

Mr. Taylor challenges Dr. Schnittker's original opinion with subsequent statements she made in her 2007 Declaration and her 2014 deposition.  According to Mr. Taylor, new evidence shows that Dr. Schnittker's assumption was incorrect.

Based on that new evidence, primarily presented through post-conviction statements of Dr. Schnittker, it appears that the bullet's proximity to Gunshot Wound #2 had very little, if any, probative value in the cause-of-death determination.  Dr. Schnittker assumed that the bullet landed there because

10

it traveled through Gunshot Wound #2.  But, as she conceded, given the handling of Kaye's body after she died, the bullet likely moved around before Dr. Schnittker discovered it.  As Dr. Schnittker notes, "An unattached bullet in the clothing may have changed position within the clothing by movement of the body after being shot and post-mortem."  (2007 Decl. of Sharon Schnittker ¶ 5, Ex. 117 to Petition, Docket No. 31-6.)

The body was moved a lot.  After Kaye was shot, she fell to the ground.  After Kaye died, Mr. Taylor and Mr. Deli dragged her body outside.  During the investigation at the cabin, Kaye's fully-dressed body was put in a body bag and transported to the autopsy.  And in preparation for the autopsy, Kaye was removed from the body bag after which the examiners rocked her from side to side and undressed her.  Given that caveat, Dr. Schnittker, in 2007, said that, "[b]ecause the bullet I recovered was not recovered from the body itself, I know of no characteristics on the bullet at this point, that allow me to definitively conclude that it went through Kaye Tiede."  (Id. ¶ 6.)

Three other aspects of the physical evidence, all of which were highlighted and clarified by Dr. Schnittker's declaration and deposition, raise questions about her original opinion.

First, the condition of the t-shirt Kaye wore under her sweatshirt was inconsistent with the conclusion that the .38 caused Gunshot Wound #2.  In 2007, Dr. Schnittker declared that she "found no exit perforation through the underlying T-shirt between the exit of the skin and the sweatshirt" and that she "would have expected to find such a perforation if the recovered projectile was responsible for Gunshot Wound #2."  (Id. ¶ 5.)  In other words, if the .38 bullet had traveled through the path of Gunshot Wound #2 and ended up in the sweatshirt, it likely would have traveled through the t-shirt before coming to rest by Kaye's right shoulder.  The lack of a perforation further undermines the

11

validity of Dr. Schnittker's conclusion.

Second, Dr. Schnittker conceded that her measurements of the entrance and exit wounds of Gunshot Wound #2 do not conclusively tie the .38 to the fatal wound. They could have been caused by a .44.

> The type of tissue beneath the skin or a wobbly bullet and other factors such as distance or an intermediate target can change the way an entrance wound looks. I reviewed a photograph of the entrance wound of Gunshot Wound #2. Gunshot Wound #2 appears to measure about 1.1 or 1.2cm in diameter. The exit wound measured 1.5cm vertically according to the autopsy report and would not exclude a .44 caliber bullet. <u>I cannot rule out a .44 caliber projectile fired from a handgun as having caused the injuries associated with Gunshot Wound #2.</u>

(<u>Id.</u> ¶ 7 (emphasis added).)

Third, the nature of Gunshot Wound #2 was consistent with the destructive capability of a bullet from a .44, which exerts more force than a .38. (Schnittker Dep. at 116.) The bullet that caused Gunshot Wound #2 was propelled by a force strong enough to move the bullet through Kaye's left shoulder, fracture her second and third ribs, pass through the upper lobe of her left lung, as well as her aorta and her right lung, and fracture the fourth right rib before exiting Kaye's body.

In short, when asked whether Gunshot Wound #2 could have been caused by a .44-caliber bullet, Dr. Schnittker replied, "Yes." (<u>Id.</u> at 112.)

Finally, Mr. Taylor uses Dr. Schnittker's reassessment of the evidence to articulate an alternative theory for the bullet's location by tying it to the superficial abrasion on Kaye's sternum. Right after Kaye was shot by Mr. Taylor, she reached for her upper body area. The abrasion was located on her chest area and had a shape similar to the nose of a bullet. The recovered bullet had a

damaged nose.

> Q.    You have said that the bullet in Kaye Tiede autopsy photo number 1 . . . has damage to the nose of the bullet?
> A.    Correct.
> Q.    And that that indicates to you that it hit something.
> A.    Yes.
> Q.    If this bullet went through something or ricocheted off something, couldn't it have hit something and then caused the abrasion to Kaye Tiede in the center of her sternum?
> A.    Yes.
> Q.    And wouldn't it then have possibly wound up inside her clothing with this damage to it?
> A.    Yes.

(Id. at 235-36.)  Also, Dr. Schnittker did not find blood on the bullet.  That fact is more consistent with an abrasion than a wound that reached from one shoulder to the other, while passing through Kaye's aorta.

Other than proximity, the record reveals no physical evidence linking the .38 bullet to Gunshot Wound #2.  (Id. at 107.)  And Dr. Schnittker could not rule out the possibility that Gunshot Wound #2 was caused by a .44.  So when asked whether she could state with a reasonable degree of medical certainty that the .38 bullet caused Gunshot Wound #2, she replied, "No."  (Id. at 112.)

Dr. Schnittker's 2007 and 2014 statements, along with Mr. Taylor's alternative theory that the .38 caused the abrasion rather than Gunshot Wound #2, raise serious questions about the accuracy of the State's conclusion that the .38 bullet fired by Mr. Taylor caused Gunshot Wound #2 and, it follows, that Mr. Taylor killed Kaye.

**B.      The Cause of Beth Potts' Death**

The State concluded that Mr. Taylor shot a .44 bullet through Beth's head.  The dispute about

the cause of Beth's death lies not with the caliber of bullet that killed her but with identification of the

man who fired the fatal shot.  To support its conclusion, the State points to Mr. Taylor's admissions that

he killed Beth with the .44, as well as Mr. Deli's statement that Mr. Taylor did all of the shooting.

The strongest part of the State's case concerning Beth's death lies with Mr. Taylor's

incriminating statements made during a psychiatric examination and a statement that was overheard by

Linae.  But Mr. Taylor proffers new evidence that undercuts the probative value of his admissions.

**1.      Statements to Dr. Moench**

Mr. Taylor's principal admissions came during a psychiatric examination that was conducted

after Mr. Taylor pleaded not guilty by reason of insanity.  Court-appointed psychiatrist Louis A.

Moench, M.D., examined Mr. Taylor to determine whether he was competent to stand trial.  Dr.

Moench then related Mr. Taylor's statements through a report to the trial court.  Two statements stand

out.

First, Mr. Taylor told Dr. Moench that he grabbed the .44 from Mr. Deli and proceeded to

shoot both women.  According to Dr. Moench, Mr. Taylor said that

> he didn't mean to shoot them and doesn't remember squeezing the trigger, but nevertheless did.
> The mother of the family was hit first and exclaims 'I've been shot!'.  Taylor then emptied his
> gun, a 38 pistol, at the victims, [then] grabbed Deli's 44 pistol, and emptied it at them.  He
> reloaded both guns and counted nine spent cartridges.

(Moench Feb. 18, 1991 Report at 4, Ex. 57 to Petition, Docket No. 20-59 (emphasis added).)

Second, Mr. Taylor said he killed the two women in "cold blood."  During the examination,

14

when Dr. Moench asked Mr. Taylor whether "he believes he is insane, he replies 'No, but how can you determine? I shot two people with no motive, out of cold blood, with my gun, then Ed's.'" (Id. at 9.)

Mr. Taylor now questions the validity and value of his admissions for a couple of reasons: (1) the conclusion that the admission is true is not supported by the evidence; and (2) Mr. Taylor had an ulterior motive to lie when he made the statements.

> a.      Likelihood that Mr. Taylor Shot the .44

Mr. Taylor offers the October 30, 2007 Declaration from Joseph Offret, one of the detectives who investigated the murders, who declared:

> At some point in the case, I believe during the trial of Edward Deli, I recall hearing that Von Taylor said he had done all of the shooting in the Tiede/Potts murders. I did not hear this directly from Von Taylor. I do not recall the source. My belief at that time was that this was unlikely. It did not appear to be supported by the evidence. Von Taylor would have had to have been firing both handguns at the same time in order to accomplish this. I recall that the shootings of the two women occurred very close together in time. I recall that this was corroborated by the testimony of the Tiede daughter who was in the cabin at the time of the shootings.

(Decl. of Joseph Offret ¶¶ 9-10 (emphasis added), Ex. 116 to Petition, Docket No. 31-5.)

As Detective Offret notes, in view of Linae's testimony about the order of events and the time frame in which they occurred, the action does not match the evidence. Linae testified that Mr. Taylor shot Kaye with the .38 while Mr. Deli was pointing the .44 in the direction of Kaye and Beth. She then said that after Kaye was shot, she turned to see her grandmother shot. When asked how long it was between the shooting of Kaye and Beth, she said "seconds." (Penalty Trial Tr. at 509.) She did not

see who pulled the trigger on the .44.

      Linae's testimony about what followed immediately after that also supports Detective Offret's conclusion.  After the shooting stopped, Mr. Deli took Linae to the bedroom and tied her up.  (Id. at 511.)  Linae testified that when Mr. Deli tied her up, he was holding a knife and the .44.  (Id. at 512.)  At the Penalty Trial, when she was asked what Mr. Deli did with the .44, Linae responded, "He called out to Mr. Taylor, asking him – saying, 'we need to reload our guns.  Did you reload yet?'  And he was holding his gun to reload."  (Id. at 513.)  Mr. Taylor was in the other room at that point.  Under those circumstances, if Mr. Taylor grabbed the .44 from Mr. Deli to shoot the women, Mr. Taylor gave it back to Mr. Deli right after the shooting and before Mr. Deli grabbed Linae.  Mr. Taylor would have had to return the .44 quickly and outside of Linae's sight, because Linae never actually saw the .44 in Mr. Taylor's possession, yet right after the shooting stopped, she was looking at Mr. Taylor who spoke to her:

> Q.     When the shooting stopped, Linae, what happened at that point; were you still praying?
>
> A.     Yeah.  Von Taylor <u>looked at me</u> and told me to shut up, it wouldn't work, 'cause he was a devil worshipper.

(Id. at 511 (emphasis added).)  Then she watched Mr. Deli walk over to her; he grabbed her by the arm and took her to the bedroom.  (Id.)  She does not testify that she saw the men exchange guns at any point, so by the time Mr. Taylor spoke to her, Mr. Deli, not Mr. Taylor, apparently had the .44.

      Detective Offret's conclusion is also bolstered by Mr. Taylor's testimony during the penalty phase that he never held the .44.  (Id. at 808.)  Although his testimony does not necessarily contradict his statements to Dr. Moench, those statements were made in a non-trial context—i.e., a psychiatric

examination to determine whether he was legally sane.  And, as noted below, Mr. Taylor may have

made his admissions during the exam with an ulterior motive: to avoid conviction by convincing Dr.

Moench that he was insane.

              b.      <u>Context in Which Statements Were Made</u>

There is evidence that Mr. Taylor made his statements to convince Dr. Moench that he was not

competent to stand trial.  During voir dire questioning of Mr. Taylor at Mr. Deli's trial, Mr. Taylor (who

had already pleaded guilty) articulated that motive:

| Q. | (By Mr. Gravis [Mr. Deli's attorney])  If I were to call you to [the] stand and ask you if you knew who Dr. Louis Moench is, what would your response be? |
|---|---|
| A. | [by Mr. Taylor] I remeber [sic] him, yes. |
| Q. | Do you recall if you had a conversation with him? |
| A. | Yes, I remember that. |
| Q. | Did you talk to him about the events of this case? |
| A. | Yeah. |
| Q. | If I were to ask you if a statement made – if you made a statement to Dr. Moench that you shot Kaye Tiede, what would your response be? |
| A. | I remember the statement. |
| Q. | I'm asking what would your response be if I put you on the witness stand? |
| A. | Yes, I did make a statement, but I would like to explain why. |
| Q. | Okay, and what would your explanation be? |
| A. | Because I plead not guilty by reason of insanity and I was hoping it would make me look more insane that it did.  No further explanation. |

(May 8, 1991 Tr. of Testimony and Colloquy in <u>State of Utah v. Edward Steven Deli</u>, at 494–95 ("Deli

Tr."), Ex. 61 to Petition, Docket No. 20-63.)  Mr. Deli's attorney did not get any further explanation

from Mr. Taylor, who had exercised his Fifth Amendment right.  But in an exchange at the end of the

colloquy, Mr. Taylor's attorney added the following explanation:

If I could make one comment.  I've talked to Mr. Taylor about this issue.  We've talked about it extensively and Mr. Taylor is trying to be up front with everybody.  So let me just state his position.  His position is in relation to the statement that appears in Dr. Moench's report, that statement being basically that he shot Beth Potts and then grabbed Mr. Deli's gun and then emptied it, his position is that, yes, he made that statement; yes, it was not a truthful statement he would be willing to testify as to his rationale for making that statement.

(Id. at 500.)[10]

## 2.    Statement Overheard by Linae

After both women had been shot, Linae overheard Mr. Taylor say that he "had to shoot the bitch in the head twice." (Penalty Trial Tr. at 513.)  The State presents Mr. Taylor's statement as an admission that he fired the shot that killed Beth.  This statement is inconsistent with the evidence that Beth was shot once in the head, although in theory Mr. Taylor may have thought he shot Beth twice in the head, when only one of his shots hit the intended target.  Still, the statement is only valuable to the State if Mr. Taylor actually fired the .44.  As noted above, that point is sufficiently contested at this

_____

[10]Edward Deli, in his August 17, 2007 Declaration, also articulates a motive for Mr. Taylor to admit to firing all of the shots and killing both women.  First he said, "Von did tell me on one or two occasions that he would take the 'rap,' or take responsibility, for the crime." (2007 Decl. of Edward Steven Deli ¶ 17, Ex. 14 to Petition, Docket No. 20-15.)  Then he declared that he and Mr. Taylor tried to say things that made them sound insane because they had pleaded not guilty by reason of insanity.

I decided to say whatever I could think of to the psychiatrist.  I assumed that if I was outrageous enough, that nothing I said would be believed.  When I was evaluated, I told the psychiatrist a number of things that were not true, including that I had killed someone else in the past.  I also told him information relating to devil worshiping.  In my mind, I was just screwing with him.  It did not occur to me that he would believe me.  Von knew that this was my intent and I believe he did the same.

(Id. ¶ 18.)  To the extent Mr. Deli has credibility, this supports Mr. Taylor's 1991 statement.

18

stage.

### 3.     Mr. Deli's Statement

Mr. Deli purportedly testified at his own trial (or at least took the position) that Mr. Taylor did all of the shooting. The record does not include a full transcript of Mr. Deli's trial. Mr. Taylor insists that Mr. Deli did not testify at all, and cites to the "Clerk's Transcript" from the case which, he says, "confirms that he never testified at his trial." (Mot. Evid. Hr'g at 25 (citing Deli CT 248), Docket No. 217.) But the State provides an affidavit from Robina Gillespie Levine as evidence that Mr. Deli did testify. Ms. Levine stated:

> As part of my duties on Mr. Taylor's defense team, I sat through the Deli trial, and, among other things, heard Mr. Deli testify . . . . that Mr. Taylor did all of the shooting and that he (Deli) shot no one.

(Feb. 11, 2009 Aff. of Robina Gillespie Levine ¶¶ 4, 6, Ex. to V to State's Response to Petition, Docket No. 125-28.) Her statement is corroborated by language in a memorandum decision addressing Mr. Taylor's post-conviction appeal. In that decision, the court said "Deli testified that Mr. Taylor did all of the shooting at the time the crimes were committed and that he (Deli) was surprised when Mr. Taylor shot the victims and that he had no actual intent to kill." (Penalty Trial Tr. at 1150.) Even if Mr. Deli did testify, as the State asserts, his veracity is questionable given that he had a motive to lie during his murder trial, especially because Mr. Taylor had already pleaded guilty. Ultimately, the jury found Mr. Deli guilty of second degree murder. Moreover, in connection with Mr. Deli's sentencing, prosecutors told the Utah Board of Pardons that Mr. Deli also fired shots. (June 14, 1991 Ltr. to Utah Bd. of Pardons from Summit County Attorneys, Ex. 127 to Petition, Docket No. 95-10.) At this stage,

the court finds that Mr. Deli's statement does not overcome the probative value of Mr. Taylor's evidence.

## IV.  ACCOMPLICE LIABILITY

The State resists the conclusion that Mr. Taylor merits an evidentiary hearing on his actual-innocence claim.  The State argues that, even accepting Mr. Taylor's assertions as true, an actual-innocence evidentiary hearing would be futile because the evidence establishes that a reasonable jury would convict him of capital murder as an accomplice.  The State contends that Mr. Taylor's plea inherently included an admission of guilt as an accomplice to capital murder, which carries the same punishment as capital murder as a principal.  Mr. Taylor responds that he did not plead guilty to accomplice liability and, accordingly, imposing accomplice liability on him now would violate his constitutional rights.

The Sixth Amendment to the United States Constitution requires that a defendant have notice of the crime to which he is pleading guilty.  Faretta v. California, 422 U.S. 806, 818 (1975), cited in D.B. v. State, 289 P.3d 459, 471 n.15 (Utah 2012).  Relying on State v. Gonzales, 56 P.3d 969 (Utah Ct. App. 2002), the State asserts that charging Mr. Taylor with capital murder as a principal gave him notice of the possibility that it would raise accomplice liability at trial and that such a possibility was adequate: "[I]f Taylor had gone to trial, and if evidence was presented that showed [Mr.] Taylor was guilty as an accomplice, the State could have asked for a jury instruction on accomplice liability."  (State Br. re: Accomplice Liability at 14, Docket No. 254 (emphasis added).)  Then, equating accomplice liability with the principal crime, the State claims that Mr. Taylor would receive the death penalty regardless of his evidence because accomplice liability carries the same punishment as principal liability.  (Id. at 4

20

("'accomplices incur the same liability as principals'") (quoting Gonzales, 56 P.3d at 972).)

But the accomplice-liability section of the Utah Code "requires conduct different from direct commission of an offense before a defendant incurs accomplice liability." D.B., 289 P.3d at 465. An accomplice is one "who solicits, requests, commands, encourages, or intentionally aids another person to engage in conduct which constitutes an offense[.]" Utah Code Ann. § 76-2-202 (Michie 1990). "Mere presence, or even prior knowledge, does not make one an accomplice to a crime absent evidence showing—beyond a reasonable doubt—that defendant advise[d], instigate[d], encourage[d], or assist[ed] in perpetuation of the crime." State v. V.T., 5 P.3d 1234, 1236–37 (Utah Ct. App. 2000) (citation and internal quotation marks omitted) (alterations in original).

Here, the State in effect asks the court to actually impose accomplice liability on Taylor. In other words, the State asks the court to conclude that because Mr. Taylor pleaded guilty to Counts I and II, it is a done deal that he is guilty of accomplice liability and so any proof of actual innocence regarding principal liability would be futile. In D.B., the Utah Supreme Court rejected an argument very similar to the one the State makes now.

The D.B. court addressed whether a defendant charged as a principal has received adequate notice under the Sixth Amendment so that he may be convicted as an accomplice. 289 P.3d at 465–68. The D.B. court quoted Gonzales, noting that "a person charged with a crime [as a principal] has adequate notice of the possibility of accomplice liability being raised at trial." D.B., 289 P.3d at 471 (citation and internal quotation marks omitted) (emphasis and alteration in original). But the court described the issue before it as whether "a defendant charged as a principal has received adequate Sixth Amendment notice that he may be adjudicated [liable] as an accomplice." Id. Distinguishing

21

Gonzales,[11] the court said that "the question of what notice is constitutionally sufficient before the State

may actually pursue accomplice liability" was one of first impression.  Id.

There, the State argued that "principal and accomplice liability do not represent separate

offenses and that its petition alleging principal liability provided [the defendant] with adequate notice,

standing alone, of the potential that he could be [convicted of the charged crime] under a theory of

accomplice liability."  Id. at 470.  The court, rejecting the State's position, held that "[c]harging an

individual as a principal, standing alone, does not provide adequate notice that the State is actually

pursuing an accomplice theory."  Id. at 471 (emphasis added).  This is because "development of an

accomplice liability after the close of evidence eliminates a defendant's ability to prepare his defense and

present evidence relating to the accomplice liability theory."  Id. at 472 (emphasis in original).

The D.B. court articulated ways in which a defendant receives constitutionally adequate notice:

> The simplest way for the State to provide adequate notice is by actually charging the
> defendant as an accomplice.  The state may also notify a defendant of potential
> accomplice liability through presentation of adequate evidence at any time prior to the
> close of evidence at trial. . . .  However, development of an accomplice liability theory
> after the close of evidence eliminates a defendant's ability to prepare his defense and
> present evidence relating to the accomplice liability theory.

Id. at 471–72 (emphasis omitted).

None of those situations occurred here.  The Information did not charge Mr. Taylor with

accomplice liability.  Nothing in the Statement of Defendant or plea colloquy mentions accomplice

---

[11] Gonzales is distinguishable from this case for an additional reason.  Mr. Gonzales did not
plead guilty.  Instead, he received a trial, after which the court concluded that the evidence did not
warrant an accomplice liability jury instruction.

liability.  And, of course, no trial occurred.  As a matter of law, Mr. Taylor did not plead guilty to accomplice liability.

The State alternatively relies on the second mode of notice listed in <u>D.B.</u>: evidence at trial proving the elements of accomplice liability.  <u>Id.</u> at 471.  The State reasons that even if Mr. Taylor did not kill either Beth or Kay, a reasonable jury would convict him as an accomplice to capital murder based on evidence already in the record, as well as Mr. Taylor's proffered forensic evidence.  But the State's scenario is hypothetical as it discusses only what the evidence <u>would</u> show to a jury <u>if</u> Mr. Taylor had gone to trial.  The State essentially asks the court to conduct the <u>Schlup</u> analysis now based on proffered, but not fully explored, evidence.  At this stage, where the court is considering only whether to grant an evidentiary hearing, such an analysis would be premature.

More importantly, Mr. Taylor could not have received notice of the State's accomplice-liability theory at trial because Mr. Taylor pleaded guilty and bypassed a trial on liability altogether.[12]  Although it is possible that a jury could have convicted Mr. Taylor of accomplice liability, he did not go to trial so we will never know.  In fact, the situation is just the opposite of what the State contends.  As Mr. Taylor

---

[12]The State's position—that charging murder gives notice of possible accomplice liability and that punishment is the same for both—could be interpreted to include the argument that accomplice liability is a lesser-included-offense of capital murder.  That cannot be so.  In Utah, a lesser-included-offense is an offense that "is established by proof of the same or less than all the facts required to establish the commission of the offense charged[.]" Utah Code Ann. § 76-1-402(3)(a) (Michie 1990).  As noted above, liability as an accomplice requires proof of elements different than those required to convict a defendant for capital murder, so it is not a lesser-included-offense of capital.  But even if it were, it would be a legal impossibility for Mr. Taylor to alternatively plead to both the murders of Ms. Potts and Ms. Tiede and being an accomplice to their murders.  "A defendant may be convicted of an offense included in the offense charged <u>but may not be convicted of both the offense charged and the included offense.</u>"  <u>Id.</u> § 76-1-402(3) (emphasis added).

23

notes, given the history of this matter—as opposed to the hypotheticals offered by the State—"[n]o reasonable juror could have convicted him of capital murder as an accomplice because he was not charged pursuant to that statute, no jury ever considered the matter, and he did not plead guilty to accomplice liability." (Reply Supp. Mot. Evid. Hr'g at 28, Docket No. 246.)

In short, because Mr. Taylor pleaded guilty only to capital murder and did not have notice of accomplice liability, the State's argument that Mr. Taylor would have been found guilty of capital murder as an accomplice and, consequently, that a <u>Schlup</u> hearing would be futile fails. The question must be whether Mr. Taylor can advance his claims that he is actually innocent of the crime to which he pleaded—capital murder as a principal—not any crime to which he could have been convicted of had he gone to trial and been put on notice.

## V. <u>CONCLUSION</u>

Mr. Taylor has sufficiently established the potential to advance his claims at this point. The court has seen enough evidence to conclude that Mr. Taylor must be given the opportunity to develop the record. And the only way to do that is through an evidentiary hearing.

## <u>ORDER</u>

For those reasons, Mr. Taylor's Motion for Evidentiary Hearing (Docket No. 217) is GRANTED on the actual-innocence claim. The court will hold a five-day evidentiary hearing on the actual-innocence claim beginning on Tuesday, August 1, 2017, at 10 a.m.

DATED this 17th day of January, 2017.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge