IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| VON LESTER TAYLOR,<br><br>Petitioner,<br><br>vs.<br><br>SCOTT CROWTHER,[1] Warden, Utah State Prison,<br><br>Respondent. | FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING CLAIM OF ACTUAL INNOCENCE<br><br>Case No. 2:07-CV-194-TC |

**<u>INTRODUCTION</u>**

Petitioner Von Lester Taylor pled guilty to two counts of capital murder for his involvement in the brutal murders of two women, Beth Potts and her daughter, Kaye Tiede, in a mountain cabin in Summit County, Utah, in 1990. At his subsequent penalty trial, a jury sentenced him to death. Mr. Taylor appealed his sentence and, when he lost his appeal, filed petitions for post-conviction relief in state and federal court. He petitioned this court for a writ of habeas corpus under 28 U.S.C. § 2254.

Some of the claims in his Petition, including those asserting ineffective-assistance-of-counsel, are barred from court review for procedural reasons. Mr. Taylor is seeking a "gateway" to allow him to lift the procedural bar. To obtain that gateway, Mr. Taylor presented evidence

_____

[1] Mr. Crowther has since been replaced as Warden of the Utah State Prison by Larry Benzon.

1

during a March 2018 hearing that Edward Deli, his co-defendant, fired the shots that killed Ms. Potts and Ms. Tiede. The court now enters findings of fact and conclusions of law, and concludes that Mr. Taylor has satisfied the requirements necessary to obtain review of his otherwise defaulted claims.

## PROCEDURAL BACKGROUND

The court recounted the story of Kaye Tiede's and Beth Potts' murders in its prior order granting an evidentiary hearing (see Jan. 17, 2017 Order and Mem. Decision Granting Evidentiary Hr'g at 1–2, ECF No. 264), but will briefly restate the relevant facts.

In December of 1990, Mr. Taylor and Edward Deli absconded from a halfway house and hitchhiked to rural Summit County, Utah. The two men burgled a number of cabins in the area, then broke into a cabin owned by the Tiede family. The family was staying at the cabin during the Christmas holiday, but had gone on a short trip to Salt Lake City and the cabin was empty.

The next day, the family returned to the cabin by snowmobile. Mr. Taylor and Mr. Deli were still inside. Ms. Tiede and Ms. Potts, along with Ms. Tiede's daughter Linae, were the first to arrive. The men ordered the women into the living room. Minutes later, and without provocation, the two men opened fire on Ms. Tiede and Ms. Potts with a .38 special revolver and a .44 magnum revolver. Ms. Tiede was hit by two bullets and birdshot. Ms. Potts was hit by three bullets. Both women died of their wounds. Eventually, the men dragged the bodies outside to the deck.

Linae's father Rolf Tiede and sister Tricia Tiede arrived by snowmobile after the shooting. Mr. Taylor shot Rolf twice in the head with birdshot rounds from the .38 special, then set fire to the cabin. Mr. Taylor and Mr. Deli fled the cabin by snowmobile, taking Linae and Tricia as captives. When they reached the Tiede's car, they abandoned the snowmobiles and

2

drove away in the car.  Linae and Tricia's uncle, Randy Zorn, saw the four drive past and called the police, who arrested Mr. Taylor and Mr. Deli after a high speed chase.

After their arrest, Mr. Taylor and Mr. Deli were each charged with ten counts, including kidnapping, arson, robbery, attempted murder (Rolf was shot with birdshot and survived), and capital murder for the deaths of Ms. Tiede and Ms. Potts.  Mr. Taylor first entered a plea of not guilty by reason of insanity.  He was evaluated by Dr. Louis Moench and Dr. Mark Rindflesh, both of whom found him competent to stand trial.  Mr. Taylor then pled guilty to two counts of capital murder as a principal for the deaths of Ms. Tiede and Ms. Potts.  At the penalty trial that followed his plea, a jury sentenced him to death, and he is currently incarcerated at the state prison in Draper, Utah.

Mr. Taylor directly appealed his sentence and, when his appeal proved unsuccessful, petitioned for post-conviction relief in state and federal court.  He filed his original petition for writ of habeas corpus in this court in 2007, and it was stayed while he pursued his state court remedies.

In 2012, after the Utah Supreme Court affirmed the denial of his state court petition for post-conviction relief, Mr. Taylor filed a second amended petition for writ of habeas corpus in this court.  (See Second Am. Pet. for Writ of Habeas Corpus ("Petition"), ECF No. 94.)  The Petition, operative here, alleges twenty-six claims challenging various aspects of his plea, penalty trial, and sentence.

Some of his claims are procedurally barred.  Typically, a federal habeas corpus court may not decide defaulted claims.  See House v. Bell, 547 U.S. 518, 536 (2006).  But the Supreme Court has crafted a limited exception to prevent a "fundamental miscarriage of justice" that would allow the petitioner to pursue the otherwise defaulted claims.  Schlup v. Delo, 513 U.S.

298, 321 (1995).  To fit within the exception, a petitioner must show that he is "actually innocent" of the crime for which he was convicted.  Id. at 327.

Actual innocence is a "gateway standard"—a threshold showing a petitioner must make before the habeas corpus court reaches additional claims for relief.  Id.  To prevail on a gateway claim of actual innocence, a petitioner "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  House, 547 U.S. at 536-37 (quoting Schlup, 513 U.S. at 327).

To that end, Mr. Taylor obtained discovery and moved for an evidentiary hearing, citing new evidence that would support his claim of actual innocence.   The court granted his request and held a three-day evidentiary hearing in March 2018.  This Order presents the court's analysis of the evidence received and whether it satisfies Mr. Taylor's burden.

The court is not deciding a substantive claim of actual innocence.  Mr. Taylor's actual innocence claim is solely procedural—a hurdle he must clear to show that his case fits within the "fundamental miscarriage of justice" exception that allows the court to reach his defaulted constitutional claims.  See Schlup, 513 U.S. at 314–15.  Actual innocence is not, on its own, a basis for habeas relief, and a finding of actual innocence will not invalidate Mr. Taylor's plea and sentence.  See Herrera v. Collins, 506 U.S. 390, 400 (1993).  It will only allow the court, in further proceedings, to evaluate the merits of Mr. Taylor's otherwise-barred constitutional claims for habeas relief.

Because Mr. Taylor pled guilty to causing the death of Ms. Tiede and Ms. Potts—that is, firing the bullets that caused the fatal wounds—he now carries the burden of showing that he is

actually innocent of causing the death of both women.[2]  In support of his actual innocence claim,

Mr. Taylor submitted new evidence at the hearing that he only fired the .38 special, not the .44

magnum, and that the .38 special did not cause the fatal wounds of Ms. Tiede or Ms. Potts.[3]  That

evidence included testimony from Mr. Deli and forensic experts.

## "NEW EVIDENCE" STANDARD UNDER *SCHLUP*

Schlup states that a petitioner must "support his allegations of constitutional error with

new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness

accounts, or critical physical evidence – that was not presented at trial."  513 U.S. at 324

(emphasis added).  The State argues that the evidence presented by Mr. Taylor is "old evidence"

that was "available at the time Taylor made the choice not to go to trial."  (Resp't Proposed

Findings of Fact and Conclusions of Law ¶ 6, ECF No. 391.)  Accordingly, it contends, Mr.

Taylor has not met his burden to come forward with new evidence.

The Supreme Court has not elaborated on what constitutes "new evidence."  The Tenth

---

[2] In its order granting an evidentiary hearing, the court ruled that Mr. Taylor only needs to show that he did not commit one of the two murders.  (See Jan. 17, 2017 Order and Mem. Decision Granting Evidentiary Hr'g at 6, ECF No. 264.)  The State, in its post-hearing briefing, argues that he must show that he is actually innocent of both, since "[e]ach murder qualified as capital" on its own.  (Resp. to Pet'r Taylor's Proposed Findings of Fact and Conclusions of Law at 4, ECF No. 393.)  The State is correct—the murder of each woman qualified as capital murder because it was committed while "engaged in the commission of or an attempt to commit, Aggravated Burglary or Burglary."  Utah Code Ann. § 76-5-202 (West 1990).  Accordingly, the court corrects its previous order.  To proceed with his defaulted claims, Mr. Taylor must show that he is actually innocent of both murders.

[3] The State once again raises the issue of accomplice liability, this time in its post-hearing briefs.  (See Resp't Proposed Findings of Fact and Conclusions of Law ¶¶ 16–25, ECF No. 391; Resp. to Pet'r Taylor's Proposed Findings of Fact and Conclusions of Law at 1–5, ECF No. 393.)  The court has already ruled on the issue.  (See Jan. 17, 2017 Order & Mem. Decision Granting Evidentiary Hr'g at 20–24, ECF No. 264.)  Notwithstanding the State's position, the court declines to reconsider or change its ruling.

Circuit has not decided the issue,[4] but other circuits have, and those decisions have created a circuit split.  See Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018) (acknowledging circuit split concerning the meaning of "new" evidence under Schlup); Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012) (same); Kidd v. Norman, 651 F.3d 947, 952 (8th Cir. 2011) (same).

The State favors a definition of "new evidence" that requires a petitioner to present evidence that could not have been discovered through due diligence before trial.  In support of this "newly available" standard, it cites to an Eighth Circuit case, Amrine v. Bowersox, 238 F.3d 1023, 1028 (8th Cir. 2001).[5]  Amrine represents the decidedly minority view.

The majority of circuits that have directly addressed the issue (the First, Second, Fifth, Seventh, and Ninth) have required only that the petitioner present new reliable evidence not previously presented—i.e., a "newly presented" standard.  See Floyd v. Vannoy, 894 F.3d 143, 156 (5th Cir. 2018); Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015); Rivas v. Fischer, 687 F.3d 514, 543 (2d Cir. 2012); Griffin v. Johnson, 350 F.3d 956, 961–63 (9th Cir. 2003); Gomez v. Jaimet, 350 F.3d 673, 679–80 (7th Cir. 2003).  In addition, three circuits have issued decisions favoring adoption of the majority view.  The Fourth and Eleventh Circuits used the "newly presented" standard without addressing the circuit split.  See Brown v. Sec'y, Fla. Dep't of Corr., 580 F. App'x 721, 727 (11th Cir. 2014); Teleguz v. Pearson, 689 F.3d 322, 331–32 (4th Cir.

---

[4] The Tenth Circuit has briefly addressed the issue in two unreported cases that do not indicate a clear appear approach to the issue.  Compare Foldenauer v. Franklin, 261 F. App'x 93, 96 (10th Cir. 2008) (petitioner's "attack on what actually occurred at trial does not constitute 'new evidence, not presented at trial'"), with Johnson v. Medina, 547 F. App'x 880, 885 (10th Cir. 2013) ("Actual innocence claims focus on 'new' evidence—'relevant evidence that was either excluded or unavailable at trial'") (quoting Schlup, 513 U.S. at 327–28).

[5] The State's additional reliance on Henry v. Ryan, 720 F.3d 1073 (9th Cir. 2013), vacated by and rehearing en banc granted by Henry v. Ryan, 766 F.3d 1059 (9th Cir. 2014), is inapposite, as explained by Mr. Taylor in his objections to the State's Proposed Findings of Fact and Conclusions of Law.  (See Pet'r's Opp'n to Resp't's Proposed Findings of Fact & Conclusions of Law at 27, ECF No. 394.)

2012).  The Sixth Circuit suggested, without deciding, that "newly presented" evidence is

sufficient under Schlup.  Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012).  In all, eight

circuits have either adopted or favorably cited the majority position.

      Only the Third and Eighth Circuits have adopted the minority position proposed by the

State—i.e., requiring that evidence in support of an actual innocence gateway claim be "newly

discovered" evidence not previously available.  See Hubbard v. Pinchak, 378 F.3d 333, 340 (3d

Cir. 2004) (finding that petitioner's "own late-proffered testimony" in a sworn statement was

"not 'new' because it was available at trial"); Amrine, 238 F.3d at 1029 (rejecting "actual

innocence" claim because petitioner failed to show "'new reliable evidence … not presented at

trial'") (quoting Lee v. Kemna, 213 F.3d 1037, 1039 (8th Cir. 2000)).

      But even the Third Circuit, in its 2010 decision in Houck v. Stickman, indicated a

willingness to apply the "newly presented" standard in a situation where certain types of

ineffective-assistance-of-counsel claims are at issue.  Specifically, the appellate court recognized

the inherent problem the "newly available" standard presents to a petitioner, such as Mr. Taylor,

whose underlying ineffective-assistance-of-counsel claims are founded on, in whole or in part,

trial counsel's failure to investigate, develop, and present the evidence being offered to pass

through the Schlup gateway.

> [A]rguably it is unfair to a petitioner to apply the Amrine statement of the law in
> cases in which the petitioner claims that he had had ineffective assistance of
> counsel by reason of his attorney not discovering exculpatory evidence when the
> petitioner is relying on that very evidence as being the evidence of actual
> innocence in a gateway case to reach the ineffective assistance of counsel claim.

Houck v. Stickman, 625 F.3d 88, 94 (3d Cir. 2010).  This is precisely Mr. Taylor's situation.  In

light of Houck, essentially only one case (Amrine) supports the State's position, which is

countered by the great weight of contrary authority.

      In addition to the weight of the precedent, this court finds the majority view persuasive

for the very reason expressed by the Seventh Circuit in a case where the petitioner raised similar

ineffective-assistance-of-counsel claims.  There, the Seventh Circuit highlighted (as did the

Third Circuit in <u>Houck</u>) the unfairness of the position the State asks this court to adopt:

> Particularly in a case where the underlying constitutional violation claimed is the ineffective assistance of counsel premised on a failure to present evidence, a requirement that new evidence be unknown to the defense at the time of trial would operate as a roadblock to the actual innocence gateway. Here, the very premise of the ineffectiveness claim is that the trial counsel knew of yet failed to present evidence that Gomez is alleging proves his innocence. If procedurally defaulted ineffective assistance of counsel claims may be heard upon a showing of actual innocence, then it would defy reason to block review of actual innocence based on what could later amount to the counsel's constitutionally defective representation.

<u>Gomez</u>, 350 F.3d at 679–80.

Finally, apart from the great weight of authority and persuasive reasoning supporting the

"newly presented" standard, the court finds that even if it were to adopt the "newly available"

standard advocated by the State, Mr. Taylor has satisfied that as well.  As demonstrated below,

the State's claim that there is no new evidence is belied by, among other things, Edward Deli's

unequivocal admission that he possessed the .44 caliber weapon throughout the shootings.  A

host of new evidence was also presented by the experts.

For these reasons, the court makes its findings of fact based on all reliable evidence in the

record, including not only Mr. Taylor's new evidence but also the evidence presented to the jury

at the penalty phase and the State's latest evidence (it is not limited to evidence presented at the

time of conviction either).[6]

---

[6] <u>See</u> <u>Bousley v. United States</u>, 523 U.S. 614, 625 (1998) (stating that the government "is not limited to the [record existing at the time petitioner pleaded guilty] to rebut any showing the petitioner might make").

## FINDINGS OF FACT[7]

Two guns—a .44 magnum and a .38 special—were used at the scene.  Ms. Tiede was shot three times, twice with bullets that went through her chest and upper torso and once with bird shot pellets that caused a series of small wounds in her left arm and neck.  Ms. Potts was shot three times (twice in the chest and once in the head).

Mr. Taylor asserts that he is actually innocent because he did not cause the death of Kaye Tiede or Ms. Potts.  To support his claim, he presented evidence that: (a) he did not fire the .44, and (b) bullets from the .44, not the .38, caused the fatal wounds in both women.

### 1. WHO FIRED THE .44 MAGNUM?

#### a. Linae Tiede's Eyewitness Statements

Besides Mr. Taylor and Mr. Deli, Linae was the only witness to the murder of her mother and grandmother.  The three women arrived at the cabin together, and Linae stood in the same room when Ms. Tiede and Ms. Potts were shot.

Linae did not testify at the evidentiary hearing, but recounted the murders five times in the record.[8]  She was interviewed twice by detectives on December 22, 1990, the day of the murders—first by Detective Berry and then by Detective Offret.  She also testified at Mr. Taylor's and Mr. Deli's preliminary hearing on January 8, 1991, and again at Mr. Taylor's penalty trial on May 16, 1991.  More recently, she was interviewed for an episode of the

---

[7] Three sets of evidence were cited by the parties.  First, they rely on exhibits attached to Mr. Taylor's Second Amended Petition.  The court refers to those exhibits as "Ex. __ to Petition."  Second, they rely on exhibits admitted during the evidentiary hearing.  Those are labeled "Pet'r Ex. __" or "Resp't Ex. __."  Finally, documents in the state record, such as the transcript of the 1991 preliminary hearing, are filed on the docket as ECF No. 398.

[8] This court did not take Linae's testimony because the most reliable evidence is contained in her statements given right after the shootings and her testimony in the months following the shooting.

television program 48 Hours titled "Three Days Before Christmas," which originally aired on

CBS on December 10, 2011.

Linae's statements and testimony consistently tied Mr. Deli to the .44 magnum and Mr.

Taylor to the .38 special.  When Detective Offret interviewed Linae on the day of the murders,

he placed the two handguns used in the shooting on a table in front of her.  In his summary of the

interview, Detective Offret wrote that Linae

> said that she recognized the pistols on the table as those that Von [Taylor] and Dave
> [Mr. Deli] used in the shootings.  She pointed to the .38 and said that it was the one
> that Von carried in a makeshift shoulder holster and used to shoot her mother and
> grandmother.  She pointed to the .44 mag and said that Dave wore that gun and
> thinks that he used the gun to shoot her grandmother but didn't actually see this.
> She said that she did see Von shoot her grandmother with the .38.  She said that
> after the shootings of her mother and grandmother Dave said that he had to reload
> the .44 mag.

(J. Offret Narrative Reports at 2, Ex. 80 to Petition, ECF No. 20-83.)

Then, approximately two weeks after the murders, at the joint preliminary hearing of Mr.

Taylor and Mr. Deli, Linae described the gun Mr. Deli held as a black handgun, larger than the

one Mr. Taylor had.  (Jan. 18, 1991 Prelim. Hr'g Tr. at 14, ECF No. 398.)  The .38 measures

approximately nine inches long, while the .44 magnum measures approximately fourteen inches

long.  (Expert Report of John Nixon at 9, Pet'r Ex. 18.)

Following Mr. Taylor's pleas of guilty, after a penalty trial, a jury decided the sentence

Mr. Taylor would receive.  Linae testified at this penalty trial.  During her testimony, she

identified State's Exhibit 9, the .44 magnum revolver, as the gun Mr. Deli had in his belt when

she first saw him in the Tiede cabin.  (Penalty Trial Tr. at 503, ECF No. 398.)  And she testified

that Mr. Taylor fired the first shot at Ms. Tiede with the State's Exhibit 10, the .38 special

revolver.

She also testified that Mr. Deli had the .44 immediately after the shooting, when he took

her into a bedroom and bound her wrists and ankles with packing tape.

> Q.    And after you were in the bedroom, did you see any weapons at that time?
>
> A.    Yes.  I saw Mr. Deli—he had a knife on me and he also had the gun.
>
> Q.    Which gun did he have?
>
> A.    The bigger gun.
>
> Q.    Are you referring to State's Exhibit Number 9?
>
> A.    Yes, I am.
>
> Q.    Is that the same gun that you had previously seen Mr. Deli with?
>
> A.    Yes.

(Id. at 512–13.)  Mr. Deli still had the .44 caliber gun when he and Mr. Taylor were getting ready to make their escape from the cabin on the Tiede snowmobiles with Linae and her younger sister as hostages.  (Id. at 524.)

Near the conclusion of her testimony at the Penalty Trial, the prosecutor asked Linae whether she had ever seen Mr. Taylor with the .44.  Her answer was "No." (Id. at 547.)

### b.  Edward Deli's Testimony

Edward Deli, Mr. Taylor's co-defendant, was the first witness at the evidentiary hearing. While being questioned by Mr. Taylor's attorney, Mr. Deli stated that he had the .44 caliber weapon with him throughout the shootings.   He testified:

> Q.    Mr. Deli, do you recall the moments in the living room of the cabin before Von Taylor first fired the .38 caliber weapon at Kaye Tiede?
>
> A.    Yes, I do.
>
> Q.    Who had the .44 caliber weapon when Mr. Taylor fired that first shot?
>
> A.    I did.
>
> Q.    Did Von Taylor ever take the .44 caliber weapon from you in the living room?

11

A.      No, he did not.

Q.      Did you ever give the .44 caliber weapon to him in the living room?

A.      No, I did not.

Q.      Mr. Deli, did you have the .44 caliber weapon in your possession for the entirety of the time in the living room when the shootings of Kaye Tiede and Beth Potts were happening?

A.      I did.

(Transcript of Evidentiary Hr'g (Tr.) at 18:6–23.)[9]

The court finds Mr. Deli's testimony credible for several reasons.  First, it matches the testimony of Linae Tiede.  As discussed above, Linae has always maintained that it was Mr. Deli who had the .44—both before and after the shooting.  And while Linae did not see who fired every shot, the shooting happened very quickly.  Mr. Taylor fired first, and the second shot came "seconds" later.  (Penalty Trial Tr. at 509.)  After the second shot, "there was all kinds of commotion going on at once."  (Id. at 510.)  Though she looked away from the men shortly after they started shooting, it is unlikely that Mr. Taylor somehow gained possession of the .44 in those moments.

Mr. Taylor also testified at the Penalty Trial.  When he was asked whether he had ever had the .44, he answered, "No, I did not."  (Id. at 808.)

In earlier proceedings, Mr. Deli and Mr. Taylor made statements that, at some point in the shootings, Mr. Taylor fired the .44.  Mr. Deli made such a statement to the officer who was preparing his presentence report following his conviction for second degree murder; Mr. Taylor made a similar statement in his interview with a court-appointed psychiatrist.  These statements

---

[9] The transcript for the court's three-day evidentiary hearing can be found on the docket at ECF Nos. 385, 386, and 387.

are not credible.

After Mr. Deli was convicted of the second degree murder of both women, he wrote a

statement that was given to the parole officer who was preparing Mr. Deli's presentence report.

Mr. Deli wrote that:

> We were planning on leaving when Linae Tiede came in.  I was in the bedroom getting the coats and the rest of the stuff.  I was scared.  I was nervous.  Then Kay [sic] Tiede and Beth Potts came in.  Von paniced [sic] and started shooting.  I was shocked.  I couldn't move.  He grabbed my gun out of the holser [sic] and started shooting with it to [sic].  I was scared that Linae was next, so I grabbed her and got her out of there.  I was scared and I did not know what to do, so I tried to get us out of there. The rest is self explanatory.
>
> Even though I didn't kill anyone or even help Von kill anyone I feel guilty.  I hate myself, and I doubt I'll ever be able to forgive myself. I doubt if I'll ever be able to cope with what happened, & I'm sorry it did.

(Deli Pre-Sentence Investigation Report at 9, Ex. 127 to Petition, ECF. No. 95-10.)

Mr. Deli repeated his denial of firing any shots in his oral interview with the same parole

officer.  (Id.)

Mr. Deli's desire to escape the blame of having fired any of the shots is understandable.

Although he had been convicted of second degree murder, he had yet to be sentenced.  He knew

that his statements would be read by the sentencing judge and it was in his best interest to

disavow an active role in the two murders.  But his denials are contrary to the statements and

testimony of Linae Tiede who was a credible witness.

Shortly after the arrests, a court-appointed psychiatrist, Dr. Louis Moench, interviewed

Mr. Taylor.   Mr. Taylor told Dr. Moench that after he had fired all the bullets in his .38, he

grabbed the .44 from Mr. Deli and continued shooting. (Feb. 28, 1991 Report of Psychiatric

Evaluation of Taylor by Louis A. Moench, M.D., at 5, Ex. 57 to Petition, ECF No. 20-59.)[10]

Later, Mr. Taylor admitted that this statement was false. He explained that he made the statement in an attempt to convince Dr. Moench that he was insane because he hoped this would bolster his insanity defense. (May 8, 1991 Tr. of Testimony & Colloquy in State of Utah v. Edward Steven Deli, at 494–95, Ex. 61 to Petition, ECF No. 20-63.)

A final piece of evidence confirms the court's belief that Mr. Deli possessed the .44 throughout the shootings: the statement of Detective Joseph Offret.

> 9. At some point in the case, I believe during the trial of Edward Deli, I recall hearing that Von Taylor said he had done all of the shooting in the Tiede/Potts murders. I did not hear this directly from Von Taylor. I do not recall the source.
>
> 10. My belief at that time was that this was unlikely. It did not appear to be supported by the evidence. Von Taylor would have had to have been firing both handguns at the same time in order to accomplish this. I recall that the shootings of the two women occurred very close together in time. I recall that this was corroborated by the testimony of the Tiede daughter who was in the cabin at the time of the shootings.

(Oct. 30, 2007 Decl. of Joseph Offret at 2, Ex. 116 to Petition, ECF No. 31-5.)

Because the court finds that Mr. Deli possessed the .44 during the shootings, the question becomes whether it is more likely than not that no reasonable juror would find beyond a reasonable doubt that .38 caliber bullets killed Ms. Tiede and Ms. Potts.

## 2. WHICH TYPE OF BULLET CAUSED THE FATAL WOUNDS IN MS. TIEDE AND MS. POTTS?

Ms. Potts was shot once in the head and twice in the chest. Ms. Tiede was shot twice in the chest and once, with bird pellets, in the left arm and neck.

---

[10] In his interview with Dr. Moench, Mr. Deli said that he had the .44 and Mr. Taylor the .38. (Feb. 28, 1991 Report of Psychiatric Evaluation of Deli by Louis A. Moench, M.D., at 5, Ex. 101 to Petition, ECF No. 20-108.)

Dr. Sharon Schnittker, the medical examiner who performed the autopsies, analyzed those wounds and later testified at the penalty phase trial about the cause of death.  Although Dr. Schnittker did not testify at the evidentiary hearing, the parties presented her opinions in written format: the autopsy reports, the 1991 penalty phase trial transcript, a 2007 declaration, and her 2014 deposition.

During the evidentiary hearing, the parties, building on Dr. Schnittker's analysis, presented expert testimony in the areas of ballistics and forensic pathology.  Mr. Taylor called Dr. Terry Haddix, a forensic pathologist, and John Nixon, a ballistics expert.  The State called Dr. Todd Grey, the Chief Medical Examiner of the office that, through Dr. Schnittker, conducted the autopsies in 1991.  The State also called Justin Bechaver, a ballistics expert.[11]

In the sections that follow, the court analyzes the wounds of each woman.  But before doing that, the court discusses the caliber and quantity of the recovered bullets and compares the destructive capability of a .38 caliber bullet to a .44 caliber bullet.

### a.  The Recovered Bullets

No bullet lodged in either woman's body.  Bird shot pellets did lodge in Ms. Tiede's left arm and neck, but none were fatal.[12]  Each fatal wound was a perforating (or "through and through") wound.

In all, nine bullets were recovered.  Investigators found a total of eight at the scene: seven .44 caliber bullets and one .38 caliber bullet.[13]  The ninth one, a .38 caliber bullet, was recovered

---

[11] The court finds that the expert witnesses are qualified to opine on the issues presented to them in their reports and at the hearing.

[12] The .38 was loaded with both solid lead bullets and bird shot cartridges (i.e., projectiles containing capsules filled with approximately 70 tiny pellets).

[13] Investigators also determined that two bullets went through the floor beneath Ms. Potts and exited the cabin through a window in the basement. Those bullets were not recovered and are not part of the investigators' inventory of bullets.  (Bullet Analysis at 3; James Bell Report at 4–5.)

during the autopsy and marked as "JB-213" by investigators.  JB-213 was not lodged in Ms.

Tiede's body.  The loose bullet was discovered when Dr. Schnittker's assistant removed Ms.

Tiede's sweatshirt.  As is discussed in more detail below, JB-213, given its location and

condition, is a major point of contention in the parties' analyses of the cause of Ms. Tiede's

second fatal wound.

### *The .44 Caliber Bullets*

Two of the seven .44 caliber bullets were not linked to the wounds of Ms. Tiede or Ms.

Potts.[14]  But the remaining five .44 caliber bullets are possibly linked.  Each was recovered in

one of two pools of blood in the living room indicating where each woman was lying after she

was shot.[15]  The bullets were either lodged in the floor boards or went through the floor boards

and subsequently linked by investigators to those perforations.

### *The .38 Caliber Bullets*

Of the two .38 caliber bullets recovered, only one—JB-213—is possibly tied to the

murders.  Investigators did not connect the other .38 caliber bullet, labeled "JB-28," to the death

of either woman.

Investigators found JB-28 in the living room next to the Christmas tree by the staircase.

The bullet had blood on it, but the amount of blood was too small to test for blood type.  Its

---

Given the substantially lower kinetic energy of a .38 bullet compared to the more powerful
kinetic energy of a .44 bullet (as explained by the experts at the hearing), it is highly unlikely that
those bullets came from the .38 special.

[14] One of the two, JB-37, was found in the middle of the living room.  (See Bullet Analysis.)
Investigators determined it was possibly fired from the .44 before the women arrived at the
cabin.  (Id.)  The other, JB-75, was found in the middle of the garage, one floor below where the
women were shot.  (Id.)

[15] See, e.g., Detective Joseph Offret's Feb. 28, 1991 Bullet Analysis, Ex. 86 to Petition, ECF No.
20-89; Detective Joseph Offret's Blood Analysis, Ex. 88 to Petition, ECF No. 20-91 (matching
victims' blood types to pools of blood on carpet).

location was, at a minimum, more than fifteen feet away from where Ms. Potts and Ms. Tiede

were lying after being shot and in the opposite direction of where the bodies were carried after

death.  (See Crime Scene Photographs of JB-28 in living room, at 156, 158–62, Ex. 9 to Petition;

Blueprint of Cabin Living Room, with James Bell's Demarcations, at 31, Ex. 7 to Petition.)

No evidence explains how the bullet got there and no evidence ties it to either victim.

That was noted in Detective Offret's February 28, 1991 Bullet Analysis (Ex. 86 to Petition, ECF

No. 20-89), and acknowledged by the report of the State's ballistic expert Justin Bechaver.  (See

Report of Justin Bechaver at 15, Pet'r Ex. 22 (concluding, with citation to Bullet Analysis as

support, that JB-28 "appear[ed] to be unrelated to the shooting of Beth Potts and Kaye Tiede").)

The State now questions the conclusion that JB-28 is not tied to either victim and

suggests that JB-28 is relevant.  First it addresses the fact that JB-28 had a trace of blood on it:

> As Taylor concedes, another .38 bullet was found at the crime scene.  That bullet
> had blood on it, but there was an insufficient quantity of blood for testing.  Taylor
> argues that it is possible that the blood belonged to him instead of to one of the
> victims.  But that is pure speculation.  It is also likely that the blood belonged to
> one of the victims.

(Resp't's Resp. to Pet'r Taylor's Proposed Findings of Fact and Conclusions of Law at 13, ECF

No. 393.)

The State is referring to a suggestion by Mr. Taylor in his assessment of the evidence:

> The State of Utah Crime Laboratory determined that the quantity of blood on JB-
> 28 was "insufficient for further testing."  (Pet. Exh. 6, State of Utah Crime
> Laboratory - Request for Scientific Analysis, dated February 22, 1991, at 57-59.)
> Thus, it is not possible to determine to whom the blood on that bullet belonged,
> but it is possible that the blood on the bullet belonged to Mr. Taylor, as there was
> a third blood type recovered in the cabin.  Ms. Tiede was type A and Ms. Potts
> was AB, but a tissue recovered from the living room and marked as JB-30, tested
> positive for type O.  (Id.)

(Pet'r's Proposed Findings of Fact and Conclusions of Law at 19, ECF No. 392.)  Mr. Taylor

cited to the blood analysis completed by investigators and written by Detective Offret, who

17

speculated that the blood on the tissue was Mr. Taylor's:

> JB30 is a small sample of blood found on a tissue that is sitting near a couch on
> the main floor. It consists of O type blood which is not consistent with Kaye
> Tiede or Beth Potts. It is reported that in many of the cabin burglaries that were
> committed in the Beaver Springs area, prior to the murders, there are small traces
> of blood. In the video tape showing Taylor in the Tiede cabin, seated on the
> couch, you can see small bandages on Taylors [sic] fingers.

(Detective Joseph Offret's Blood Analysis at 2, Ex. 88 to Petition, ECF No. 20-91; Still

photograph of Von Taylor's hand, taken from Christmas Video, Ex. 40 to Petition, ECF No. 41.)

As for the location of the bullet, the State then proposes a scenario about how the bullet

could have caused one of the fatal wounds and then come to rest away from the bodies:

> [E]veryone agrees that the bodies were moved after the murders.  Taylor, Deli,
> and Linae were still in the cabin for some time after the murders, and fire
> personnel also walked around inside the cabin before crime scene investigators
> arrived.  The bullet could have passed through one of the victims and landed on
> the floor, where it was then inadvertently kicked or rolled across the room.

(Resp't's Resp. to Pet'r Taylor's Proposed Findings of Fact and Conclusions of Law at 13, ECF

No. 393.)

The possibilities presented by both sides about the significance of JB-28, while perhaps

plausible, are speculative.  Neither party's point convinces the court that the existence, condition,

and location of JB-28 has any material bearing on the cause of the women's wounds or that a

reasonable juror would engage in such speculation.

Accordingly, because the court has found that Mr. Taylor did not possess the .44 during

the shootings, the crucial piece of ammunition is JB-213, the only remaining .38 caliber bullet,

which, as noted above, was discovered during the autopsy when Ms. Tiede was being undressed.

But JB-213 has its own host of problems.  As laid out below in the court's analysis of Ms.

Tiede's wounds, the circumstances surrounding JB-213, which the State asserts killed Ms. Tiede,

raise more questions than answers.

### b. Bullet Energy

Because the energy of a fired bullet is a key consideration when determining which

weapon was used to kill the victim, the kinetic energy of .38 caliber bullets and .44 caliber

bullets was discussed at length by both parties' experts at the evidentiary hearing.  Mr. John

Nixon, Mr. Taylor's ballistics expert, described bullet energy, explaining:

> when I assess the damage – or the wound potential of ammunition, I consider the
> kinetic energy that is generated. …  When you have a round of ammunition
> combined with a firearm, you have a certain weight of projectile, and it is
> launched at a velocity, which varies depending on how much propellant you have
> in the cartridge and the length of the gun barrel, and kinetic energy is calculated
> [based on a mathematical formula].

(Tr. at 167–68.)

All of the experts discussed and referred to data showing that a .44 caliber bullet has

approximately four times the kinetic energy of a .38 caliber bullet.  Dr. Haddix and Dr. Grey

referred to the treatise <u>Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic</u>

<u>Techniques, Second Edition</u>, by Vincent Di Maio, which describes the destruction potential of

.38 caliber bullets and .44 caliber bullets.  A comparison of the bullet and weapon characteristics

is set forth in the treatise, which demonstrates the significant difference between the two

calibers.[16]

Mr. Nixon and Mr. Justin Bechaver, the State's ballistics expert, effectively confirmed

those numbers.  Mr. Nixon said the kinetic energy of a .38 bullet is "approximately 200 to 210

foot-pounds," while the kinetic energy of a .44 caliber "typically has an [sic] 850 to 900 foot-

---

[16] A .38 Special bullet weighs 158 grams whereas a .44 Magnum bullet weights 240 grams.  The
muzzle velocity of the .44 is almost twice that of a .38 (i.e., 1350 feet per second versus 755 feet
per second).  And the .44 Magnum's muzzle energy is more than four times that of the .38 (971
feet per pound versus 200 feet per pound).  (<u>See</u> Table 7.1 excerpted from Vincent J.M. Di Maio,
Gunshot Wounds, Practical Aspects of Firearms, Ballistics, and Forensic Techniques (2nd ed.
1999), Ex. 122 to Petition, ECF No. 95-5.)

pounds of kinetic energy."  (Id. at 213–14.)  Mr. Bechaver testified that he believed the kinetic

energy of the .38 caliber bullet to be "somewhere two to 300-foot pounds of energy."  (Id. at

537.)  He testified that a .44 caliber bullet was "somewhere around 900 to a thousand feet per

second."  (Id.)

Given that data, and drawing on their experience with gunshot wounds, all of the experts

easily agreed that a .44 caliber bullet has the ability to inflict far greater damage than a .38

caliber bullet and that its potential to penetrate objects is significantly greater than that of a .38

caliber bullet.  Not surprisingly, the disagreement came when each party's experts offered their

opinions about what caliber bullet caused each of the women's fatal wounds.

## KAYE TIEDE

The autopsy report on Ms. Tiede identified five wounds.  Two were fatal.

Dr. Schnittker referred to the three non-fatal injuries to Ms. Tiede as "Gunshot Wound

#3," "Graze Wound," and "Abrasion."

Gunshot Wound #3 was caused by bird shot pellets fired from the .38 which lodged in

Ms. Tiede's left hand, left arm, and the left side of her neck.  As seen in an autopsy photo of Ms.

Tiede, and as described by Dr. Grey, there were "lots of small, little red to almost black dots

extending from her [left] shoulder down to her elbow and then upwards on to her forearm and

wrist. … [T]hose are all individual pellet strikes."  (Tr. at 314.)

Ms. Tiede also suffered a superficial graze wound on the left arm near the arm pit.  The

graze wound began with "an abrasion at one end, followed by an actual gouge or loss of skin,

and underlying tissue with small radiating tears that point down toward the hand before the

wound essentially trails out."  (Id. at 303–04 (Dr. Grey testimony)).)  Given those physical

characteristics, Dr. Grey concluded that the bullet causing the graze wound travelled from the

left armpit area towards Ms. Tiede's left elbow.  As discussed below, the bullet causing one of Ms. Tiede's fatal wounds (referred to as "Wound 1") exited Ms. Tiede's body in the left armpit area.  Both Dr. Haddix and Dr. Grey surmised that the graze wound, given its location and shape, could have been created by the same bullet that caused Wound 1.  In other words, the bullet would have exited Wound 1 and continued along the surface of her inner arm.

Finally, Dr. Schnittker noted an abrasion on Ms. Tiede's sternum.  An abrasion is "an area of scraping of the outer layer of the skin."  (Id. at 317.)  The abrasion was small and was located "[i]n the midline of the presternal region at the level of the 1st rib" (i.e., "in front of the breastbone … about the level of the first ribs"[17]).  She described it as having "a similar configuration to that of a nose of a bullet."  (Autopsy Report for Kaye Tiede at 6, Pet'r Ex. 1.)  Dr. Schnittker, by comparing the shape of the abrasion to the nose of a bullet, gave life to Mr. Taylor's early theory that JB-213 caused the abrasion.  Although this theory engendered much attention in the briefs and during the evidentiary hearing, Mr. Taylor has since abandoned it.[18]

These wounds are not directly relevant to Mr. Taylor's actual innocence claim.  But, as

---

[17] Tr. at 129 (Dr. Haddix testimony).

[18] At one point Mr. Taylor theorized that the abrasion could explain the location and presence of JB-213.  (See Mot. Evidentiary Hr'g at 28–31, 37–39, ECF No. 217 (suggesting that Mr. Taylor's first shot—which, according to Linae Tiede, caused Ms. Tiede to raise her hands to her sternum—caused the superficial abrasion on the sternum).)  Accordingly, the parties elicited expert testimony in an effort to determine its cause.  The State offered an alternative theory through the testimony of ballistics expert Mr. Bechaver, who opined that the abrasion may have been caused by a "wad cap" coming from the capsule containing the .38 shot pellets that were fired at Ms. Tiede.  (Bechaver Report at 11; Tr. at 472–73, 493, 509.)  Mr. Nixon, who was also asked to determine whether the abrasion could have been caused by an obturation wad from the .38 cartridge as opposed to a bullet, reached the opposite conclusion based on his own testing.  (See, e.g., Nixon Report at 2; Tr. at 176.)  Dr. Haddix was not convinced by either theory.  And Dr. Grey summarily rejected Mr. Taylor's theory.  Regardless of the differing opinions about whether a wad cap could have caused the abrasion, it became apparent at the hearing that all of the experts rejected Mr. Taylor's theory that JB-213 caused the abrasion.  And even if the court adopted the theory that a wad cap caused the abrasion, that would not convince the court that the existence of JB-213 means, by process of elimination, that Wound 2 was caused by a .38.

21

discussed below, the nature and location of each wound were cited by the experts during their analyses of the causes of Ms. Tiede's two fatal wounds.

As for Ms. Tiede's fatal wounds, Dr. Schnittker, Dr. Haddix, and Dr. Grey agree that Ms. Tiede died from the combination of the injuries identified in the autopsy report as Gunshot Wound #1 ("Wound 1") and Gunshot Wound #2 ("Wound 2").[19]

Although each wound was potentially fatal in and of itself, neither immediately or individually killed Ms. Tiede. As Dr. Haddix explained, "[t]here are two wounds that I think are fatal for Ms. Tiede, Wound Number One … that entered the back and exited the front injuring the axillary artery, and then Wound Number Two that passed through both lungs and the aorta." (Tr. at 66.) Dr. Haddix thought that both were responsible because "her cause of death is basically blood loss, and . . . both of those wounds are going to bleed quite briskly." (Id.) Dr. Grey concurred. (Id. at 312.)

**Kaye Tiede's Wound 1**

***Nature of Wound 1***

Wound 1 was a perforating, or "through-and-through," wound, meaning the bullet exited the body. (Ms. Tiede Autopsy Report at 4.) The bullet that caused Wound 1 entered Ms. Tiede's upper left back and exited under the left front of the armpit region. (Tr. at 299.) The bullet caused a "3-4 cm lacerated and hemorrhagic gunshot wound track passing through soft tissue and muscle" as it passed "from back-to-front, from right-to-left at approximately a 20-30 degree angle, and from above downward at approximately a 20-30 degree angle." (Ms. Tiede Autopsy Report at 4.) In addition to passing through muscle and soft tissue, the bullet fractured the left

---

[19] The numbering is arbitrary because the order in which the wounds were inflicted cannot be determined.

posterior second and third ribs, perforated and fractured the left scapula (shoulder blade), and completely cut through a medium-sized artery called the axillary artery in the area of the left armpit.  (Id.; Tr. at 49 (Dr. Haddix testimony)).)

### *Cause of Wound 1*

During the Penalty Phase Trial, Dr. Schnittker opined that Wound 1 was most likely caused by a .44 caliber bullet.  She testified that "the diameter of the wound fairly closely matched a large caliber, which would be a 44 Magnum or 45, more closely than it matched a medium caliber, such as a .38." (Penalty Phase Tr. at 706–07 (emphasis added).)

It appears from her choice of words that she was basing her opinion on the size of the wound track or, alternatively, the size of the wound's entrance and exit holes.  As the experts, including Dr. Schnittker, have noted on the record, using that type of data to estimate the caliber of bullet is not a reliable method.

Indeed, in 2007, Dr. Schnittker, in her declaration, recognized that determining the caliber of a bullet by measuring the size of the entrance or exit wound is not a reliable method.  "Mistakes can be made when trying to determine the caliber of a bullet by measuring the size of an entrance wound.  The type of tissue beneath the skin or a wobbly bullet and other factors such as distance or an intermediate target can change the way an entrance wound looks."  (2007 Decl. of Sharon Schnittker ¶ 7, Ex. 117 to Petition, ECF No. 31-6.)

And Dr. Haddix has explained that wound track size is not a reliable indicator of bullet caliber either:

> As a bullet is passing through tissue, it creates what's called a temporary cavity, meaning that the amount of tissue destruction that happens along that path of the bullet extends out greater than the actual diameter of the bullet itself.  Now tissues have varying degrees of elasticity associated with them.  So depending upon the elasticity of it, you may end up with a larger defect.  You may end up with a smaller defect.  So it's not -- there's a problem with, number one, determining

23

exactly how far out the area of damage actually goes, and it may well be beyond what appears to only be bloody.  Number two, depending upon the nature of the other organ it may go through, like, for instance, the lung, which is involved in several gunshot wounds in this case, that structure, the lung that is, collapses down.  So at autopsy, obviously, we are viewing the lung in its collapsed condition after it's been injured.  As it's collapsed down, it is a smaller -- it's a smaller structure.  And the apparent wound path also appears smaller too.

(Tr. at 51.)

Regardless, Dr. Schnittker, during her 2014 deposition, shifted the basis for her opinion. There she testified that the damage found in Wound 1, including a perforated scapula and two broken ribs, was consistent with the energy of a .44 caliber bullet.  (2014 Dep. of Sharon Schnittker at 69, Pet'r Ex. 102.)

Dr. Haddix reached the same conclusion.  She relied primarily on "the nature of the injury, the structures that were damaged during the course of that, and … the overall destructive nature of the wound."  (Tr. at 53.)  Pointing to the facts that "three separate bony structures" were fractured and that the bullet causing the wound actually exited the body, she testified that Ms. Tiede's Wound 1 was "more compatible with it being a .44 than a .38."  (Id.)

Dr. Grey was more equivocal.  He testified that "after analyzing all of the information," he concluded that Wound 1 was consistent with a .38, but that he "would not exclude a .44," saying it "could have been either."  (Id. at 301.)  He based that on "the track of destruction that was described in Dr. Schnittker's report," which he said was "more consistent with the energy of a .38 than of a .44 magnum."  (Id. at 302.)  But during cross-examination, Dr. Grey said he "couldn't be sure."  He thought the bullet "[c]ould be, might not be" a .38," but that he was "not going to say that with certainty."  (Id. at 362–63.)  Dr. Grey's uncertainty is understandable, as his opinion is contradicted not only by the other experts but by other evidence in the record.

For instance, Dr. Grey concluded that the perforation in "the sweatshirt and the jacket …

24

near the elbow area of the left sleeve," could have been caused by a bullet exiting Wound 1 and

tearing through the clothing.  (Id. at 452.)  If that is true, it is logical to conclude that Wound 1

was caused by a .44 caliber bullet, because if the bullet left the clothing, it could not have been

JB-213 and the other recovered bullets tied to the crime were .44 calibers.  (See Bullet Analysis;

James Bell Case Report, Pet'r Ex. 8; Crime Scene Photographs at 117–28, Pet'r Ex. 9.)

In addition, investigators found three bullet holes in the floor beneath the pool of blood

where Ms. Tiede fell to the ground, all of which were attributed to .44 caliber bullets found at the

scene.  (Penalty Trial Tr. at 560–61; Crime Scene Photographs at 117–28.)  James Bell, the lead

scene investigator, was confident that at least one of those .44 bullets hit Ms. Tiede.  During the

penalty phase trial, he explained.

> Q.     Did you form an opinion with respect to the position of Kaye Tiede when
>        she was hit?
>
> A.     At one point she would have been down when she was shot; but at what
>        point, I cannot tell you that.
>
> Q.     And how do you explain the other two bullet holes?
>
> A.     There's a possibility she could have been shot while she was down a
>        couple of times.  And it's a possibility that -- it's not unusual for people to
>        miss people on the floor when they're on the floor shooting at them.
>
> Q.     At least one of the shots hit Kaye Tiede while she was on the floor?
>
> A.     Yes.

(Penalty Trial Tr. at 567; see also Crime Scene Photographs at 117–28.)

Based on the above, the court finds that Wound 1 was likely caused by a .44 caliber

bullet.  The expert opinions of Dr. Schnittker and Dr. Haddix are convincing and solidly

grounded on the evidence.  The bullet causing Wound 1 had enough power to go through Ms.

Tiede's scapula before breaking two ribs, exiting the body, and tearing through her clothing.  As

explained by the ballistics experts, that destructive energy is consistent with the power of a .44,

not a .38, bullet.  Added to evidence of that destruction is evidence that .44 bullets were fired directly into the area where Ms. Tiede fell.  And, finally, the court does not give much weight to Dr. Grey's somewhat ambivalent opinion.  Indeed, Dr. Grey's uncertainty highlights the lack of evidence needed to convince a reasonable juror beyond a reasonable doubt that a .38 bullet caused Wound 1.

Accordingly, the court finds that Mr. Taylor has satisfied his burden of showing that no reasonable juror would convict him of killing Ms. Tiede based on Wound 1.

### Kaye Tiede's Wound 2

#### *Nature of Wound 2*

Like Wound 1, Wound 2 was a perforating wound that, in and of itself, would have been fatal without prompt medical attention.  (Penalty Phase Tr. at 709–10; Tr. at 114–15.)  The bullet causing Wound 2 entered the left shoulder, crossed through the upper part of Ms. Tiede's torso, and exited the right side of her body in the armpit area just below the shoulder.  (Tr. at 308, 311.)

According to the autopsy report, it passed "from left-to-right, from above downward at approximately a 30 degree angle, and from front-to-back at approximately a 20-30 degree angle," leaving "a 4 cm lacerated and contused gunshot wound track."  (Ms. Tiede Autopsy Report at 5.)  The destruction was significant.  The bullet went "through the musculature of the left shoulder, enter[ed] the chest cavity fracturing through the left 2nd and 3rd ribs posteriorly; passe[d] through-and-through the upper lobe of the left lung, pericardial sac, ascending aorta, upper lobe of the right lung, middle lobe of the right lung, and fracture[d] the right lateral 4th rib prior to exiting."  (Id. at 4–5.)

26

### *Cause of Wound 2*

The State contends that Mr. Taylor fired the .38 at Ms. Tiede and caused Wound 2.  To support their position, they called Dr. Grey, who opined that Wound 2 was more likely than not caused by a .38 bullet, specifically JB-213.  But the remaining experts—Dr. Schnittker, Dr. Haddix, and Mr. Nixon—testified that the destruction in Wound 2 was more consistent with a .44 bullet and that the existence of JB-213, given the circumstances and condition of the bullet, did not change their opinions.

#### a.  *The Discovery of JB-213*

JB-213 was discovered during the autopsy when Dr. Schnittker's autopsy assistant was undressing Ms. Tiede's body.  When Ms. Tiede was killed, she was wearing relatively loose clothing: nylon pants, a t-shirt that was layered with a sweatshirt and nylon jacket, and a scarf around her neck.

Her body was moved multiple times after she died.  First, her fully-clothed body was dragged to the cabin deck outside.  After Mr. Taylor and Mr. Deli were arrested and the investigation began, the officials transported her body to the medical examiner's office.

When Ms. Tiede arrived at the medical examiner's office, she was fully clothed and wrapped in a quilt.  As was standard practice, the medical examiner's office took photographs of Ms. Tiede fully dressed and took x-rays of her body before removing her clothes.  Other than the bird shot pellets, no projectile showed up in the x-rays.  During that process, Ms. Tiede's body was moved numerous times and rocked back and forth.

Then they began to remove her clothes.  In the autopsy report for Ms. Tiede, under "Bullet Recovery," Dr. Schnittker wrote "During removal of the sweatshirt, a projectile is located in the right shoulder region which appears to be adjacent to the exit of Gunshot Wound

#2." (Ms. Tiede Autopsy Report at 5.) That projectile was JB-213. The autopsy photos show JB-213 lying on the quilt next to Ms. Tiede's right shoulder. (<u>See</u> Ms. Tiede Autopsy Photographs at 73, 77, Pet'r. Ex. 2.)

Although the bullet was loose, the record is not clear whether it fell out of the sweatshirt or was lying next to the sweatshirt when it was discovered. During Dr. Schnittker's 2014 deposition, she was asked, "Do you know whether the bullet was outside or inside the sweatshirt?" (Schnittker Dep. at 102.) After she reviewed the report's "Bullet Recovery" section and autopsy photos of JB-213 lying on the quilt next to Ms. Tiede's right shoulder, she said:

> Well, according to this photograph, it's outside or it fell out possibly during the time [the autopsy assistant] was trying to get [the sweatshirt] off the body. … It's possible that either when he opened [up the quilt in which Kaye Tiede was wrapped, JB-213] was there; or according to my autopsy report, as he was trying to pull off the sweatshirt, which he probably would have had to eventually do over the head, it must have fallen possibly into that area. I don't think we know exactly how it got there.

(<u>Id.</u> at 102.)

JB-213 was collected as evidence. It was damaged slightly. As is discussed below, the extent of that damage was one factor the experts used when reaching their conclusions about whether JB-213 caused Wound 2.

### *b.  Problems Associated with JB-213*

The circumstances surrounding the discovery and condition of JB-213 have created significant concerns about the reliability of JB-213 as evidence that Wound 2 was caused by a .38 caliber bullet.

### *Ms. Tiede's Body Was Moved Many Times Before the Discovery of JB-213.*

As described above, Ms. Tiede's clothed body was moved first by Mr. Taylor and Mr. Deli, then by the investigators who took the bodies to the medical examiner's office, and, finally, by Dr. Schnittker and her assistant during the autopsy.  Although the loose bullet was discovered near Ms. Tiede's right shoulder when her sweatshirt was removed, assigning a loose bullet to a wound when the bullet was discovered after significant movement of the bodies is problematic. As Dr. Haddix noted, the manipulation of her clothed body "should give you even more pause at simply attributing a bullet found adjacent to an area as being responsible for that injury."  (Tr. at 125.)

### *JB-213 Was Not Seen in the X-Rays.*

As part of the usual procedure, Dr. Schnittker took x-rays of Ms. Tiede.  The purpose is in part to determine whether any projectiles or fragments of projectiles are lodged in the body. (Id. at 410.)  Other than the pellets on Ms. Tiede's left side, her body was clear of any bullet. Yet Ms. Tiede was x-rayed with her clothes on.  (Id. at 413–14.)  So if JB-213 was in the t-shirt or sweatshirt, why didn't the x-rays detect it?

### *The Clothes Are Missing.*

If a .44 caliber bullet caused Wound 2, the experts agree it would have exited Ms. Tiede's clothing and left a perforation on the right side of Ms. Tiede's t-shirt, sweatshirt, and nylon jacket.  Accordingly, Mr. Taylor's position that a .44 bullet caused Wound 2 rests partly on the existence of a perforation in the right side of the clothing.

The best evidence of the existence of a hole (or lack of a hole) is, of course, the clothing itself.  But the clothing, which would normally have been in the custody of the Summit County

Sheriff's Office, is missing.[20]  (See id. at 417–19.)

The experts agree that the clothing should have been examined and that it would have played an important role in their opinions.  Although the autopsy photos show the condition of some of Ms. Tiede's clothes, they are not helpful.  The experts were limited to a review of the only useful evidence of the condition of Ms. Tiede's clothing: the diagrams in the autopsy report.

Dr. Schnittker did not document any bullet holes on the right side of the t-shirt, sweatshirt, and jacket near the exit of the bullet that caused Ms. Tiede's Wound 2.  It follows, asserts the State, that JB-213 spent its energy as it went through Ms. Tiede's torso and came to rest in the sleeve of her t-shirt or sweatshirt, which would explain the lack of a hole in the clothing and the existence of the bullet found during the autopsy.  Stated another way, the State suggests that a .44 could not have caused Wound 2 because there would have been an exit hole in the clothing and such a hole would have been documented by Dr. Schnittker.  But there is a discrepancy in the diagrams that gives the court pause.

The problem is illustrated by a lengthy exchange between Mr. Taylor's counsel and Dr. Grey during the evidentiary hearing.  There, Mr. Taylor demonstrated that although Ms. Tiede's left shoulder and neck had pellet wounds, the diagrams did not show corresponding pellet holes in the left sleeve of her t-shirt:

> Q.      Is it possible that there are holes in the clothing that you cannot see in the photographs we have?
>
> A.      Certainly.

---

[20] During the evidentiary hearing, Mr. Taylor suggested that spoliation had occurred.  (Tr. at 434.)  He presented evidence that the Office of the Medical Examiner may have mistakenly sent the clothes to the mortuary rather than to the Summit County Sheriff's Office.  (See id. at 418–20, 430–40.)  But the court is not making a spoliation finding.  Rather, given the discrepancies in the clothing diagrams coupled with the inability to resolve those discrepancies by examining the clothing, the court need only find that the clothing diagrams are not credible evidence supporting the State's theory that JB-213 caused Wound 2 and came to rest in Ms. Tiede's sleeve.

Q.      And we don't have close-ups of the right side of the clothing, do we?

A.      I do not recall seeing specifically that area of the clothing photographed.

Q.      Are there pellet wounds -- let me use your arm.[21] Thank you. Thank you for your arm. There were pellet wounds in her shoulder area here, right?

A.      Yes.

Q.      And this shoulder area, she was wearing a sweatshirt, a T-shirt and a jacket, right?

A.      Correct.

Q.      Can you find anywhere -- have you seen anywhere in Dr. Schnittker's autopsy report where she indicates holes from pellets in the T-shirt?

…

THE COURT: You probably know the answer to this, Mr. Pomerantz. Is there any indication?

MR. POMERANTZ: There's no indication that I have seen, Your Honor. If he wants to correct me, that's fine. But I have never seen one.

THE COURT: So ask your next question.

THE WITNESS: Wait a minute. Let's not get ahead of ourselves. The inferior-anterior left sleeve of the T-shirt has four perforations representing through and through gunshot wounds. So there is a description of damage to the T-shirt.

BY MR. POMERANTZ:

Q.      Right, there is. But those [four perforations] have been tied -- by Mr. Bechaver's theory, those have been tied to the exit of gunshot wounds [sic] number one?[22]

_____

[21] The arm referenced here is not the witness' arm, but the arm of the mannequin the witness brought as a demonstrative exhibit.

[22] Mr. Bechaver, the State's ballistics expert, hypothesized that the four perforations were caused by the bullet that exited Wound 1 (and which probably caused the graze wound). He concluded that the bullet causing Wound 1

    exit[ed] through the left axilla, perforating the inferior-anterior t-shirt sleeve while also grazing the medial aspect of the left posterior upper arm [the graze wound] (this would require the left arm to be in a position slightly above the exit wound in the axilla and across the front of the body with the t-shirt exhibiting folding or

…

A.      Yeah.

Q.      So [the recorded damage] is not [from] pellet wounds, if Mr. Bechaver is correct?

A.      Correct.

Q.      And if Mr. Bechaver is incorrect, if he's incorrect and those are actually pellet wounds, then where are the holes for the exit of gunshot wound number one? Are those described --

A.      You've lost me. I agree with you that those T-shirt holes are most likely from the grazing exit wound on the back of her left arm.

Q.      My point is if you're wrong and they're not and those are actually pellet wounds, then do you see a description of another area that could be where gunshot wound number one would have exited through?

A.      No.

(Tr. at 416–18.)

With only the four perforations marked (and the court is convinced that these were caused by the bullet exiting Wound 1),[23] nothing accounts for pellets that clearly perforated the outer clothing and lodged in her skin. This leads to the inescapable conclusion that pellet perforations that had to exist in the left sleeve of the t-shirt (which was between the sweatshirt and her skin), were not recorded in the autopsy report.

During the evidentiary hearing, counsel for the State questioned Dr. Grey about a possible explanation that would avoid the court's conclusion.

Q.      … What is your understanding as to why there would be four perforations

_____

bunching of the sleeve), and then perforating the elbow region of the sweatshirt and the nylon jacket. … <u>The lack of additional perforations in the clothing external to the graze wound also supports the conclusion that the graze wound is part of this trajectory</u>.

(Bechaver Report at 12 (emphasis added).)
[23] The four perforations, which are the same size and lined up a row on the underside of the sleeve, are too large to be caused by pellets. (<u>See</u> Ms. Tiede Autopsy Report at 22.)

there?

A.     Folds in the fabric.

Q.     Would that mean that the sleeve was likely bunched up there?

A.     That certainly would explain it, yes.

Q.     And if the sleeve were bunched up, is it possible that it was bunched up high enough that the pellet wounds that hit in the shoulder there didn't actually go through the T-shirt?

A.     That's a possibility too, yes.

(Id. at 457.)  Of course no one knows for sure whether the t-shirt was bunched up.  Dr. Grey

acknowledged that, but added that "the fact that there's four holes from one track would indicate

it is folded."  (Id. at 459.)

    Setting aside the State's speculation, facts highlighted during the cross-examination of

Dr. Grey suggests that the State's theory is incorrect.  The essence of the discussion (see id. at

458, 460–61) was this: even if the t-shirt sleeve was bunched up, the pellets above Wound 2's

entrance hole (which was unmistakably marked on the diagram)[24] would have left perforations

above the perforation caused by the Wound 2 bullet and should have been marked on the

diagram.  But they were not.

    So the question is whether Dr. Schnittker or her assistant overlooked or erroneously

failed to document a perforation on the right side of Ms. Tiede's clothing.  The answer is not

clear[25] because the clothes were not preserved.  At a minimum, the discrepancy raises a serious

---

[24] See Autopsy Photo of Ms. Tiede's upper left arm, Resp't Ex. 5.44 (showing pellet wounds above and near Wound 2's entrance hole).
[25] Dr. Haddix suggested that autopsies are not an ideal place to thoroughly examine clothing. She testified that she would have liked to have seen the clothing "to be able to look more carefully . . . with the abundance of time, better lighting and things like that, with no real time constraints in order to be able to see if I found any additional defects," because as she explained "outside the setting of the autopsy, you don't have the same time constraints and you have a greater amount of time to examine things."  (Tr. at 47.)

question of whether the autopsy diagrams are reliable evidence that would allow a reasonable

juror to find beyond a reasonable doubt that a .44 bullet did not cause Wound 2.

<u>The Damage to JB-213 Was Relatively Minor.</u>

Dr. Haddix, who looked at the bullet under a microscope, said the deformation of the

bullet was "very focal and very minor."  (<u>Id.</u> at 62.)   All of the damage she viewed was in one

isolated area.  To her, associating the bullet with Wound 2, in which three ribs were struck,

> <u>would stretch the imagination that every single time that bullet struck a bone, it
> only struck in that one area</u>.  The distribution of that damage is not what [one]
> would expect for what's passing through three ribs or impacting three ribs in
> order to produce fractures.  It's neither significant enough nor is it widespread
> enough.

(<u>Id.</u> at 126 (emphasis added).) [26]

Dr. Grey, in his report, described the bullet as "minimally deformed."  (Report of Dr.

Todd Grey at 5, Pet'r Ex. 14.)  Still, he questioned Dr. Haddix's conclusion.

> My own experience in the examination of hundreds of gunshot victims is that the
> degree of deformation in a solid unjacketed round that has perforated ribs and/or
> other relatively thin bony structures is quite variable.  As we do not know what
> the BHN (Brinell Hardness Number) of the recovered round is or Ms. Tiede's
> bone density, it is quite speculative to claim the degree of deformation is
> impossible for a projectile that passed through the structures damaged in the track
> of wound 2.

(<u>Id.</u> at 8.)  He also provided an example from one of his earlier cases (referred to by Mr. Taylor

as "Grey's case"), where the damage to a .38 caliber bullet was minimal despite hitting the

sternum and lodging in the spine.[27]  (Tr. at 353–55, 409.)

---

[26] The fact that JB-213 was damaged does not mean that it must have been the bullet that caused
Wound 2.  Indeed, the weight of expert testimony suggests that the damage was not caused by
hitting Ms. Tiede's ribs.  In light of that evidence, the source of JB-213's damage cannot be
established without engaging in speculation.

[27] According to Mr. Taylor, Grey's case supports his position that a .38 caliber bullet would not
be able to traverse the torso and exit the body.  There, the bullet did not have enough kinetic
energy to clear the victim's body.  Instead, it travelled "[n]ot even more than four or five inches"
before stopping in the spine.  (Tr. at 408.)

This anecdotal evidence is not particularly helpful.  The picture of the bullet in Grey's case lacks the clarity of the photographs of JB-213. (Compare Photograph of bullet from Grey's case (Resp't Ex. 25) to Photograph of JB-213, Ex. 18 to Petition, at 24.)  And the density of the bones in Grey's case is also unknown.

In any event, the questions raised by Dr. Grey do not refute Dr. Haddix's logical conclusion that a bullet striking multiple bones would have damage on more than one side.  As discussed below, Mr. Nixon, drawing on his ballistics expertise, believed that JB-213 would have had significantly more damage if it had caused Wound 2.  This bolsters Dr. Haddix's conclusion.

### JB-213 Had No Blood on It.

JB-213 did not have any blood on it.  To explain this, the State intimated during questioning of Dr. Grey that residual blood on JB-213 was wiped off by the clothing.

Q.    In your opinion is it possible that a bullet that has passed through a human body might not later test positive for blood?  Is that possible?

A.    That's possible.  It depends on a lot of factors.

Q.    How would that be possible?  What would some of the factors be that would affect that?

A.    If the bullet was washed.  If the bullet had passed through other materials that may have wiped external materials from the surface.  It's really just quite variable.

Q.    Could clothing wipe the blood from a bullet?

A.    Some of it certainly.

(Tr. at 290–91.)

The State's suggestion does not seem plausible if one accepts the State's theory that JB-213 caused Wound 2 and came to rest just outside the exit wound.  The bullet causing Wound 2 crossed all the way through Ms. Tiede's torso, and, in the process, created a four-centimeter

laceration in her aorta ("the major artery that leaves the heart and provides blood to the body"[28]). The experts agree that Ms. Tiede likely bled to death, and that is certainly indicated by the large pool of blood in the living room and by Ms. Tiede's blood-soaked clothes.  On the autopsy report's clothing diagrams, Dr. Schnittker depicted the location of blood stains, including blood stains in the right underarm region of Ms. Tiede's t-shirt.  (See Ms. Tiede Autopsy Report at 2, 22.)  If JB-213 was lodged in Ms. Tiede's blood-soaked t-shirt where the bullet supposedly lay from the time she was shot until the time she was undressed at the autopsy (a period of approximately sixteen hours),[29] and even if it rolled against the fabric of the t-shirt or the sweatshirt (also blood-soaked in areas), it seems very unlikely that the bullet would have been wiped completely clean.

The issues regarding the reliability of JB-213 carry over to the experts' opinions about the caliber of bullet that caused Wound 2.

### c.  *Expert Testimony*

#### *Dr. Haddix's Opinion*

Dr. Haddix concluded that Wound 2 was more consistent with a .44 caliber bullet.  She described the damage the bullet caused:

> This bullet – within this bullet's path, again, there were three bony structures which were fractured.  There were two fractures on the left-hand side, there was a fracture of right rib four.  There were also injuries to both lungs.  The upper lobe of the left lung and both the upper and middle lobe of the right lung.  And then there was also an injury to the aorta, and the part of the aorta just as it's arising off the heart.

(Tr. at 54.)  In reaching her conclusion, she considered "the structures that were actually injured

---

[28] Tr. at 313 (Dr. Grey testimony).
[29] The autopsy report indicates that Ms. Tiede died on December 22, 1990, at 3:30 p.m.   The medical examiner began the autopsy on the morning of December 23, 1990, at 8 a.m.  (Ms. Tiede Autopsy Report at 1.)

along the wound path, specifically the fractures of three ribs, and also the fact that it – actually, after striking all of those various structures, actually was capable of exiting the body." (Id. at 58.)

She further testified that, for a number of reasons, she did not think JB-213 caused Wound 2. First, she stated that JB-213, a .38 caliber bullet, would not have had enough energy to cause the damage. She could not recall in her experience having seen such damage caused by a .38 bullet.[30]

Second, she discounted the fact that JB-213 was discovered by Ms. Tiede's right shoulder as the sweatshirt was being removed from the body. She felt it was problematic to determine that a .38 caliber bullet caused Wound 2 based on the proximity of JB-213 to the exit hole of Wound 2, particularly if the bullet was free in the clothing while the body was being moved about.

She also clarified that she was not suggesting one should ignore where the bullet was found. "You should document where it was found, but before you are going to go and try to link it to something, you need to think about what else is going on in that wound path and does this bullet actually jibe with what I've seen elsewhere within the body." (Id. at 120–21.) Here, Dr. Haddix found other physical evidence that convinced her that Wound 2 was more consistent with a .44 caliber bullet.

Finally, she considered the appearance of JB-213. She looked at the bullet under a microscope, finding that the deformation of the bullet was in one discrete area:

> [The bullet] was still rounded. Off to one shoulder of it, I'd call it towards the tip, but not at the tip, there was a little bit of damage, some gouging that was present there. But the bulk of the bullet was actually in really quite good shape. So all of

---

[30] Dr. Haddix estimated that she has performed 400 to 600 forensic gunshot wound autopsies in homicide cases. (Tr. at 105–07.)

the damage I viewed was on to one side.

(Id. at 62.)  (See also Photographs of JB-213, attached as appendices to Nixon Report, Figs. D1a

and D1b, Pet'r Ex. 18.)  Dr. Haddix believed that if JB-213 had fractured three ribs, it would

have been more damaged. "The distribution of damage is … neither significant enough nor is it

widespread enough."  (Tr. at 126.)

### Dr. Schnittker's Opinion

During the penalty phase hearing, Dr. Schnittker opined that Wound 2 was caused by a

.38 caliber bullet.  But, for the reasons discussed below, that opinion is questionable, as even Dr.

Schnittker later admitted.  In fact, at her 2014 deposition she changed her opinion and concluded

that Wound 2 was more consistent with a .44 bullet.  She confirmed that the opinion she

provided at the penalty phase trial was based solely on the location of JB-213.

> Q.      … [B]eyond the close vicinity of the exit point of gunshot wound number
>         two to the bullet that you found, was there anything in the autopsy that
>         linked this bullet to gunshot wound number two?
>
> A.      The fact that it's on the right side of the body versus the left side of the
>         body, which [sic] the gunshot wound number one's exit was located, that
>         is the only thing linking it to this gunshot wound number two versus
>         gunshot wound number one or a gunshot wound that did not enter one or
>         two.

(Schnittker Dep. at 107.)  In other words, she "assumed that gunshot wound number two was

caused by a .38 because [she] found the .38-caliber bullet, not because of anything found in

gunshot wound number two itself exclusive of the bullet."  (Id. at 118.)  She explained:  "I put it

under gunshot wound number two because I thought it was probable. … In other words, there's a

possibility that it isn't correct because it wasn't actually in the body."

(Id. at 120–21.)

Presented with a hypothetical that removed JB-213 from the equation and focused only

on the physical characteristics of the wound, she materially changed her opinion.

38

> Q.    If we had never found this bullet in the clothing … is there anything in the autopsy, [sic] that would have led to you to conclude that this gunshot wound number two was caused by a .38-caliber bullet rather than a .44-caliber bullet?
>
> A.    No.

(Id. at 117.)  Ultimately, she came to the same conclusion that Dr. Haddix reached:

> Q.    Was [the damage documented in] gunshot wound number two consistent with the energy of a .44-caliber bullet?
>
> A.    Of the destructive capability?
>
> Q.    Yes.
>
> A.    Yes.

(Id. at 116.)

### *Mr. Nixon's Opinion*

Mr. Nixon found it highly unlikely that a .38 caliber bullet (whether JB-213 or any other .38 bullet) caused Wound 2.  He also opined that the damage on JB-213 was not consistent with the characteristics of Wound 2.  To reach these conclusions, he considered the kinetic energy of .38 and .44 caliber bullets, the destructive path of the bullet, the results of a shooting demonstration he conducted in his lab, and his examination of the damage to JB-213.

As noted above, the kinetic energy of a .38 caliber bullet is approximately one fourth the kinetic energy produced by a .44 caliber bullet.  In Mr. Nixon's experience, "38 Special projectiles typically do little damage to those they impact."[31]  (Nixon Report at 4.)  He was "very confident a .44 magnum could cause" the damage seen in Wound 2, which he felt was "a very severe wound for a .38 special."  (Tr. at 218.)  "It would seem very unlikely that such a 38

---

[31] "In one case [he] worked on a slim young man who was shot in the chest with a 38 Special +P round (more potent than in this case) and the bullet passed between the ribs and lodged in the lung."  (Nixon Report at 4.)

Special bullet would have the capability to penetrate a shoulder and then traverse the full width of a large human torso, breaking 3 bones and penetrating several organs along the way.  A 44 Magnum would be expected to do this."  (Nixon Report at 4.)

To reinforce his conclusion, he conducted a shooting demonstration "using 3 layers of pig ribs and similar 38 Special ammunition (158 grain lead round nose)."  (Id. at 4.)  He tied three pig ribs and surrounding muscle together with wires and set them up with fabric ("toweling material") behind them.  The "layers of terry toweling … were there to arrest any bullets that got through the pig ribs."  (Tr. at 219.)  The slab measured five-and-a-half inches wide.  (Id. at 279.)  Then, using the same gun Mr. Taylor used, he fired three .38 caliber test bullets[32] into the pig ribs.

The demonstration illustrated the relatively limited power of a .38 caliber bullet.[33]  "[W]hen the bullets penetrated 3 ribs they were spent (exhausted)."  (Nixon Report at 4.)  At the hearing, he testified that he "knew numerically what the [kinetic] energy [of a .38 caliber bullet] was, but [the demonstration] was just designed – or intended to demonstrate that a .38 bullet … is essentially spent once it's been through those ribs."  (Tr. at 279–80.)

The State pointed out at the hearing that Mr. Nixon's report does not describe the thickness of the ribs themselves or how they compared to Ms. Tiede's ribs.  (Id. at 260.)  But the demonstration was not intended to recreate the condition of Ms. Tiede's torso.  Also, Mr. Taylor pointed out that the bundle of pig ribs measured five and a half inches, which was, at most, half the width of Ms. Tiede's torso.  (See Ms. Tiede Autopsy Report at 4 (providing measurements showing that the 37 centimeter path of Wound 2 is approximately fourteen inches).)

---

[32]Mr. Nixon used ammunition that had the same characteristics as JB-213.  (See Tr. at 164–65.)
[33]See Table D1, Nixon Report at D2, Pet'r Ex. 18.

The demonstration also showed that "lead bullets do sustain a significant amount of damage when they impact bones." (Tr. at 279.) After firing the three .38 caliber test bullets into the pig ribs, Mr. Nixon compared those bullets to JB-213. In his report, he noted that although the three test bullets "penetrat[ed] less material than incident bullet JB-213," they "show[ed] a greater degree of damage." (Nixon Report at D2.) The difference in damage is quite apparent from the photos. [34]

That damage was more consistent with what he would expect to see on JB-213 if it had caused Wound 2. When asked whether he had "an opinion as to the likelihood that a bullet from the .38 special in this case caused gunshot wound number two to Kaye," he responded, "I think it's very unlikely given the level of energy available and the lack of damage to JB-213." (Tr. at 223.)

### Dr. Grey's Opinion

Dr. Grey opined that Wound 2 was more likely than not caused by a .38 bullet. He based his opinion on the size of the wound track, the path of destruction, the fact that a .38 caliber bullet (JB-213) was recovered near the exit wound, and the sizes and appearances of the entrance and exit wounds. (See id. at 313–14, 402–03; Grey Report at 6.) Much of the evidence upon which Dr. Grey relied is simply unreliable.

As noted above, JB-213 is plagued with problems. While at first glance it might appear that the recovery of JB-213 in Ms. Tiede's clothes indicates that Wound 2 was caused by a .38 caliber bullet, closer examination of the remaining evidence demonstrates the problems with that conclusion. JB-213 is not present on the X-rays, the bullet had very little damage to it despite

---

[34] See the photographs attached to Mr. Nixon's report at Appendix D, Figures D1, D2, D3, and D4. (Id. at 24–26)

having supposedly hit three ribs, the kinetic energy necessary to pass all the way through Ms.

Tiede's body is not present in a .38 caliber bullet, it would have had to traverse over fourteen

inches through her body, including through her aorta, and yet somehow escape without getting a

single drop of blood on it, and investigators found three .44 caliber bullets fired through the floor

beneath where Ms. Tiede was lying after she was shot.

Dr. Grey also relies in part on wound track size and the diameters of the exit and entrance

wounds.  Yet the experts agree that relying on this information, particularly the size of exit and

entrance wounds, is fraught with problems.  (See, e.g., Tr. at 51 (Haddix testimony); Schnittker

Dep. at 167, 171.)

Moreover, Dr. Grey's attempt to correlate wound track size to bullet caliber created

inconsistent results in his opinions.  This is shown in Demonstrative Exhibit #23, created during

the evidentiary hearing when Dr. Grey was cross-examined.  (See Tr. at 363–64; Pet'r's

Proposed Findings of Fact and Conclusions of Law ¶¶ 130–33.)  The inconsistency may be

explained by Dr. Grey's reliance on the location of JB-213 to determine the caliber of bullet that

caused Wound 2.  A colloquy during the evidentiary hearing demonstrates the questionable

weight Dr. Grey placed on JB-213.

> Q.     So you are more sure that the larger wound track [in Wound 2] is a .38
>        than you are on the smaller wound track [in Wound 1]?
>
> A.     Yes.
>
> THE COURT: Again, why is that?
>
> …
>
> THE WITNESS: The sum totality of the information we have, including the
> recovery of JB-213.
>
> THE COURT: So the recovery of JB-213 somewhat trumps, so to speak, the size
> of the wound?

THE WITNESS: A centimeter difference in wound track, yes.

(Tr. at 404–05.)

Dr. Grey's conclusion is difficult to reconcile with the evidence and the other experts' opinions.  Dr. Haddix's, Dr. Schnittker's, and Mr. Nixon's opinions are more compelling.

Overall, given the record, including the expert witness opinions, coupled with the inherent unreliability of JB-213 and the clothing diagrams, the court finds it more likely than not that no reasonable juror would find beyond a reasonable doubt that Wound 2 was caused by a .38 caliber bullet.

## BETH POTTS

Beth Potts was shot three times—once in the head (Gunshot Wound #1), once in the left chest (Gunshot Wound #2), and once in the right breast (Gunshot Wound #3).[35]  All three gunshot wounds were perforating, meaning the bullets entered then exited her body.  Gunshot Wound #1 is the only wound Beth suffered that can reliably be attributed to a certain gun.  All three medical examiners—Dr. Schnittker, Dr. Grey, and Dr. Haddix—agreed that it was likely caused by a .44 caliber bullet.

Crime scene investigators found a large amount of Beth's blood on the carpet in the living room near the kitchen bar.  Four bullet holes penetrated the floorboard under the blood-soaked carpet.  A strand of Beth's hair was embedded in one of the bullet holes.

Investigators found two of the bullets, both .44 caliber, in the basement below.  The other two bullets travelled outside the house through a basement window and were never recovered.

Linae Tiede saw her grandmother shot but did not see who was shooting.  She testified

---

[35] Each gunshot wound is numbered solely for the purpose of identification.  Dr. Schnittker, Dr. Grey, and Dr. Haddix all agree that they cannot determine the order Ms. Potts suffered each wound.

that she saw "blood spray everywhere," then "turned and was facing kind of near the fireplace wall and started to pray."[36]  (Penalty Trial Tr. 510.)  She twice stated that the initial shot struck Ms. Potts in the head—first in her interview with Detective Berry on the day of the murders, and years later during an interview for the 48 Hours episode.  She also told Detective Berry that she heard Mr. Taylor say just after the shooting that he "shot the bitch in the head two times."  (Tr. of Dec. 22, 1990 Interview of Linae Tiede at 5, Ex. 79 to Petition.)

Mr. Taylor bases his claim of actual innocence on the proposition that "Ms. Potts was killed with a .44 caliber bullet fired by Edward Deli."  (Mot. for Evidentiary Hr'g at 28, ECF No. 217.)  And he advances main two theories: first, that Gunshot Wound #1 was the sole fatal wound, and second, that even if the other lethal wound, Gunshot Wound #2, contributed to her death, it too was caused by a .44 caliber bullet.

### Beth Potts' Gunshot Wound #1

#### *Nature of the Wound*

Gunshot Wound #1 was the single most devastating wound Ms. Potts suffered.  The bullet entered Ms. Potts' right temple, "passed through the upper portion of the cranial vault, a case in which the brain sits, and then exit[ed] in the top of the head, essentially in the middle." (Tr. at 326.)  The bullet travelled "from below upward, from right-to-left at a 30 to 45 degree angle, and from front-to-back at approximately a 45 degree angle."  (Autopsy Report for Beth Potts at 4, Pet'r Ex. 3.)  It created an oval-shaped entrance wound measuring 2.5 by 1.5 centimeters, and a much larger star-shaped exit wound measuring 9 by 15 centimeters.

---

[36] Linae gave contradictory testimony at the preliminary hearing, where she indicated that she saw Mr. Taylor turn and shoot Ms. Potts in the head.  (Prelim. Hr'g Tr. at 16.)  But the court gives greater weight to her penalty trial testimony, especially in light of the strong forensic evidence that Ms. Potts was shot in the head with a .44 caliber bullet, and Linae's consistent association of the .44 caliber handgun with Mr. Deli.

The bullet created a "lacerated and contused gunshot wound track" through the right temporal, frontal, and parietal lobes of her brain.  (Id.)  According to Dr. Haddix, "[i]t produced large tears of skin, numerous fractures of the top of the skull, so the vault of the skull, as well as fractures of the base of the skull.  It damaged the brain itself."  (Tr. at 75.)  Parts of Beth's brain avulsed, or left her head.

Dr. Haddix opined that Gunshot Wound #1 was "rapidly fatal."  (Report of Terry Haddix, M.D., at 9–10, Pet'r Ex. 11.)  She testified that the wound would have killed Ms. Potts in "seconds" or "[m]aybe a minute."  (Tr. at 78.)

Dr. Grey opined that Gunshot Wound #1 likely would have been "instantly incapacitating" but not instantly lethal.  (Grey Report at 3.)  While Ms. Potts "would be unable to engage in any conscious volitional activity" after suffering the wound, "it did not cause immediate cessation of cardiac and respiratory activity."  (Id.)

### *Cause of the Wound*

All three medical examiners agreed that Gunshot Wound #1 was likely caused by a .44 caliber bullet.  At the penalty trial, Dr. Schnittker testified that "[t]he size of the entrance wound and size and destruction of the head was consistent with a .44."  (Penalty Trial Tr. at 704.)  Dr. Haddix agreed, opining that "[t]he sheer degree of tissue disruption is beyond that which would be expected from a .38-caliber bullet."  (Haddix Report at 11.)  So too did Dr. Grey.  (Grey Report at 4.)

## Beth Potts' Gunshot Wound #2

### *Nature of the Wound*

Gunshot Wound #2 entered the front of Ms. Potts' chest, just to the left of the midline, and exited near her left armpit.  The entrance wound measured 1.3 centimeters vertically by 0.9

centimeters horizontally—a diameter that included a .02 to .03 centimeter ring of abrasion.  The exit wound was of similar size, measuring 1.3 centimeters horizontally by 0.8 centimeters vertically.

The bullet passed from the front of Ms. Potts' chest to the back—from right to left at a 60-degree angle, and from above downward at a 45-degree angle.  It passed between two ribs (the left anterior third intercostal space), through the lower lobe of her left lung, and fractured her left fifth rib before leaving her body.  It created a lacerated and hemorrhagic wound track, and, in addition to passing through the lower lobe of her left lung, caused a three centimeter contusion to the upper lobe of her left lung.  (Ms. Potts Autopsy Report at 4–5.)

On its own, and without prompt medical attention, the wound would have caused Ms. Potts to bleed to death.  Dr. Gray testified that Ms. Potts would have died within "minutes" of being shot.  (Tr. at 333.)  During the autopsy, Dr. Schnittker found 250 cc's of blood (about a cup) in Ms. Potts' left chest cavity.

### ***Cause of the Wound***

Dr. Schnittker opined at Mr. Taylor's penalty trial that the size of Gunshot Wound #2 "was consistent with a medium caliber or [.]38." (Penalty Trial Tr. at 704.)  In a 2014 deposition, she testified that her opinion was based on the size of the entrance wound.  A gun's caliber roughly equates to the diameter, in inches, of the bullet it shoots (for instance, a .44 caliber gun uses a bullet measuring approximately .44 inches).  The wound measured 1.3 centimeters wide horizontally, which is was wider than a .44 caliber bullet, but 0.9 centimeters (or about .35 inches) vertically, which is narrower.  While recognizing that "there is a definite problem with correlating the base of the bullet with the entrance wound in any case," (Schnittker Dep. at 167), and that doing so was "fraught with error," (id. at 171), Dr. Schnittker testified in her deposition

that "you usually can't make a smaller hole with a larger bullet." (Id. 171.)

Dr. Grey "thought" that Gunshot Wound #2 "was consistent with a .38," but "wasn't absolutely sure." (Tr. at 335.) He believed that "the description of the wound track, the damage along the wound track was consistent with that caliber of projectile and energy." (Id. at 335.) But he would not correlate the size of the entrance and exit wounds to the caliber of the bullet: "looking at the size of the wounds, I'm not going to try to call caliber based on size of wounds. Could it be a .44? It's possible." (Id. at 336.)

Dr. Haddix was also uncertain about the caliber of bullet that caused Gunshot Wound #2. She noted that Dr. Schnittker's description of the wound track might not have captured the full extent of damage:

> So, number one, Dr. Schnittker does not describe exactly how she's going about making these measurements of wound paths in terms of diameters, radius, or whatever it is that she's doing. And then she's also looking at an already damaged structure that loses its shape and collapses down on itself. So while in the fully inflated state it may have actually been over a much broader range. When a lung collapses down, even if it's only a partial collapse down, that's going to alter what the appearance of that area of hemorrhage is.
>
> Lastly, as I mentioned before, the damage can be above and beyond what appears as just blood to the naked eye. There can be other damage that extends beyond that.

(Id. at 96.) She concluded that the wound could have been caused by either a .44 or a .38 caliber bullet. (Id. at 111.)

## Beth Potts' Gunshot Wound #3

### _Nature of the Wound_

Unlike the other wounds to Ms. Potts, Gunshot Wound #3 was not lethal. The bullet entered her right breast and exited near her right shoulder, passing through the pectoralis major muscle and fracturing the right scapula. The bullet travelled from front to back, from below upward at a 45 degree angle, and left to right at a 5 to 10 degree angle. It caused a four

47

centimeter lacerated and hemorrhagic wound track.

Gunshot Wound #3 was certainly serious.  But Dr. Schnittker testified at the Mr. Taylor's penalty trial that the wound "should not by itself have been fatal."  (Penalty Trial Tr. at 711.)  At the evidentiary hearing, Dr. Haddix and Dr. Grey both agreed.  Dr. Grey testified that, for a healthy individual, "this wound would have been no fun at all.  It would have hurt.  It would have been difficult to recover from, but it would not necessarily be lethal unless unexpected complications intervened."  (Tr. at 339.)

### *Cause of the Wound*

At the penalty phase of Mr. Taylor's trial, Dr. Schnittker testified that Gunshot Wound #3 could have been caused by a .38 or .44 caliber bullet, but "it was more consistent with the larger caliber because of the larger size of the entrance wound."  (Penalty Trial Tr. at 705.)

Dr. Haddix also believed that "either a .38 or a .44 could be responsible for this wound path." (Tr. at 98.)  But she considered Dr. Schnittker's reliance on wound size to be flawed.  She noted wound's the "atypical" and "irregular" appearance, and its location on an area of the body where skin and tissue lacked elasticity.  (Id. at 98.)  Dr. Grey, while not certain, thought a .44 caliber bullet caused the wound.

## The Cause of Beth Potts' Death

### *Was Gunshot Wound #1 the Sole Cause of Death?*

In his motion for an evidentiary hearing, Mr. Taylor presented a theory that only Gunshot Wound #1 was fatal—that Mr. Deli first shot Ms. Potts in the head with the .44 magnum, killing her "immediately." (Mot. for Evidentiary Hr'g at 19, ECF No. 217.)  And even if Mr. Taylor shot Ms. Potts in the chest, he did so "after she was already dead." (Id.)

Mr. Taylor's theory assumes, then, that Gunshot Wound #1 preceded Gunshot Wound #2.

Linae Tiede's statements to Detective Berry and in the 48 Hours program—that she saw her grandmother suffer an initial gunshot wound to the head—lend some support to the theory. But none of the experts at the evidentiary hearing provided any insight into the order that Ms. Potts sustained her wounds. And at the penalty trial, Detective Bell credibly opined that Ms. Potts was lying on the ground when she was shot in the head, which suggests Ms. Potts had already been shot when she suffered Gunshot Wound #1:

> Q. Based upon your examination of the crime scene, did you form an opinion as to the position of Beth Potts at the time that she was struck by the bullets?
>
> A. Yes, I did.
>
> Q. And what is that opinion based on?
>
> A. She was on the floor on her back, face up when she was shot.
>
> Q. And how do you base that opinion?
>
> A. First of all, the head shot that took place. The bullet travelled obviously though her head gathering hair. And the bullet continued through the floorboard, and part of Mrs. Pott's [sic] hair was removed right out of the floorboard.
>
> Q. So she was on the floor when the bullet hit her head area?
>
> A. Yes, she was.

(Penalty Trial Tr. at 564.)

In his Proposed Findings of Fact, Mr. Taylor proposes a related theory—that regardless of the order in which Ms. Potts suffered her wounds, Gunshot Wound #1 killed her before the others had a fatal effect. In support, Mr. Taylor focuses on the quantity of blood that Dr. Schnittker found in Ms. Potts' chest cavity as a result of Gunshot Wound #2. According to Mr. Taylor, the relatively small amount of blood—250 cc's—indicated post-mortem oozing,[37] and

---

[37] The term "oozing" refers to blood loss after death, and is distinct from the term "bleeding," which denotes blood loss that occurs when the heart is still beating. (See Tr. at 80 (Haddix testimony).)

that Ms. Potts was already dead when the bullet passed through her.  Dr. Haddix testified that she had observed blood pool in areas of trauma on an already-dead body.  And she referred to three studies that measured post-mortem blood collection in the chest cavity in amounts ranging from 50 to 1,300 cc's.

But evidence also suggest that Ms. Potts was not necessarily killed immediately.  Dr. Grey opined that the 250 cc's of blood indicated ante-mortem bleeding, not post-mortem oozing. Dr. Schnittker observed areas of bruising on Ms. Potts' scalp, which also indicated ante-mortem bleeding after she suffered her head wound.

While the amount of blood in Ms. Potts' chest fits within the documented ranges for post-mortem oozing, it does not necessarily indicate that she was dead or alive when she received Gunshot Wound #2.  Ms. Potts bled a great deal.  In the kitchen, where she was shot, her blood seeped through the floor, along an electrical conduit, and onto a light fixture in the basement. When her body lay outside on the deck, her blood dripped through the deck boards and froze into stalactites.  The blood in her chest cavity reflected only part of her overall blood loss, and does not necessarily indicate whether Ms. Potts was dead or alive when she suffered Gunshot Wound #2.

The evidence does not allow the court to determine whether Gunshot Wound #1 alone, or Gunshot Wounds #1 and #2 together, caused Ms. Potts' death.  In isolation, Gunshot Wound #1 certainly would have killed Ms. Potts more quickly than Gunshot Wound #2.  But, even assuming Gunshot Wound #1 was the first wound, the court cannot determine, based on the evidence presented by the parties, the time it took to Ms. Potts to die from her wounds, or whether Gunshot Wound #2 hastened her death.  The State has presented credible evidence that Gunshot Wound #1 would not have been instantly fatal.  Gunshot Wound #2—a near-

simultaneous, independently fatal injury—could have contributed to her death.

### *Was Gunshot Wound #2 Caused by a .38 Caliber Bullet?*

The court now turns to Mr. Taylor's other theory of the case—that Mr. Deli inflicted Ms. Potts' fatal chest wound with the .44 caliber handgun, and so fired both fatal shots. The court finds that reasonable doubt exists about the caliber of gun that caused the wound.

The strongest evidence indicating that a .38-caliber bullet caused Gunshot Wound #2 was the testimony of Dr. Schnittker at the penalty trial. She testified that the size of the wound was "consistent with" a medium-caliber bullet such as a .38. But she based her opinion on the size of the entrance wound—a methodology that she and the other medical experts recognized as flawed.

Both Dr. Grey and Dr. Haddix expressed uncertainty about the caliber of the bullet that caused the wound. Dr. Grey would not use wound size to correlate bullet caliber and testified that a .44 bullet could have caused the wound. Dr. Haddix gave credible testimony about the problems with correlating wound size to bullet caliber, and likewise testified that a .44 bullet could have caused the wound.

This uncertainty, coupled with Mr. Deli's testimony that he held the .44-caliber handgun throughout the shooting, creates reasonable doubt about Mr. Taylor's guilt. While the evidence does not conclusively resolve the caliber of bullet that caused Gunshot Wound #2, a reasonable juror would not be able to find beyond a reasonable doubt that a .38 caliber bullet caused either of Ms. Potts' fatal wounds.

### CONCLUSIONS OF LAW

Mr. Taylor bears the burden of establishing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup v. Delo,

513 U.S. 291, 327 (1995).  The court's job is to determine, after reviewing all of the evidence and, if necessary, assessing credibility, whether it is "more likely than not any reasonable juror would have reasonable doubt" regarding whether Mr. Taylor fired the fatal shots that killed Kaye Tiede and Beth Potts.  House v. Bell, 547 U.S. 518, 538 (2006); Schlup, 513 U.S. at 330.

The Schlup standard is not a "conclusive exoneration" standard.  See House, 547 U.S. at 553; Schlup, 513 U.S. at 330.  And it "does not require absolute certainty about the petitioner's guilt or innocence."  House, 547 U.S. at 538.  Rather, it requires the court, in light of the total record, to make "a probabilistic determination about what reasonable, properly instructed jurors would do."  Schlup, 513 U.S. at 329.  "The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors."  House, 547 U.S. at 538.

The court finds that Mr. Taylor has met his burden.  Edward Deli possessed the .44 caliber weapon during the shootings.  Consequently, for a reasonable juror to convict Mr. Taylor of killing Kaye Tiede or Beth Potts, the juror would have to conclude that the evidence shows, beyond a reasonable doubt, that a .38 bullet caused at least one of each woman's fatal wounds. The evidence points to a .44 caliber bullet, not a .38 bullet, as the cause of death for both women.

Given the reliable physical evidence and the weight of the expert opinions, the court holds that no reasonable, properly instructed juror, viewing the record, would have concluded beyond a reasonable doubt that Mr. Taylor fired the fatal shots that caused the deaths of Beth Potts and Kaye Tiede.  In other words, no reasonable juror, conscientiously following the appropriate instructions requiring proof beyond a reasonable doubt, would have voted to convict Mr. Taylor of the charges to which he pleaded, capital murder as a principal.

For these reasons, the court concludes that Mr. Taylor is entitled to the gateway <u>Schlup</u> allows.

DATED this 25th day of February, 2019.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge