IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| VON LESTER TAYLOR,<br><br>                    Petitioner,<br><br><br>vs.<br><br><br><br>SCOTT CROWTHER, Warden, Utah State Prison,[1]<br><br>                    Respondent. | ORDER GRANTING<br>SECOND AMENDED PETITION<br>FOR WRIT OF HABEAS CORPUS<br>PURSUANT TO 28 U.S.C. § 2254<br><br><br><br>Case No. 2:07-CV-194-TC |

Petitioner Von Lester Taylor has filed a petition under 28 U.S.C. § 2254 asking the court to vacate the death sentence he received after pleading guilty to two murders.  For the reasons set forth below, the court GRANTS Mr. Taylor's Petition and VACATES his sentence.

## **INTRODUCTION**

In December 1990, Mr. Taylor and his Co-Defendant Edward Deli broke into an empty mountain cabin owned by the Tiede family.  On December 22, 1990, when Kaye Tiede, Linae Tiede and Beth Potts arrived, the men opened fire on Kaye Tiede and Ms. Potts with a .38 special revolver and a .44 magnum revolver.  Both women died of multiple gunshot wounds. The men kidnapped Linae and her sister Tricia (who had arrived with her father, Rolf Tiede,

---

[1] Although Robert Powell is the current Warden of the Utah State Prison, he has not been officially substituted for Mr. Crowther.

soon after the shooting), shot Mr. Tiede with bird shot pellets, set the cabin on fire, and fled. They were arrested after a high-speed chase and charged with first degree murder.[2]

In May 1991, Mr. Taylor pled guilty to two charges of capital murder for causing the deaths of Ms. Tiede and Ms. Potts. He was sentenced to death and is currently incarcerated at the Utah State Prison awaiting execution. Edward Deli is serving a life sentence for his role in the murders.

In 2012, after Mr. Taylor's unsuccessful post-trial and post-conviction appeals to the State courts, he filed his Second Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (SAP)[3] in which he asks this court to vacate his sentence.[4] He raises twenty-six claims[5] to support his assertion that his sentence is invalid because it was imposed in violation of his constitutional rights.

Most compelling of those is Claim Four, in which he contends that he received ineffective assistance of trial counsel in connection with his guilty plea. Specifically, Mr. Taylor contends that his trial attorney failed to conduct the investigation necessary to properly advise him about whether to plead guilty. In fact, he says his attorney did not conduct any investigation. Mr. Taylor further asserts that an investigation would have uncovered forensic evidence casting significant doubt on the assumption that Mr. Taylor fired the bullets that killed

---

[2] For a complete account of events surrounding the murders, the court refers the reader to two of this court's previous orders: the January 17, 2017 Order and Memorandum Decision Granting Evidentiary Hearing (ECF No. 264), and the February 25, 2019 Findings of Fact and Conclusions of Law Regarding Claim of Actual Innocence (ECF No. 399).

[3] ECF No. 94.

[4] He filed his original petition in 2007, but the case was remanded to state court for further post-conviction review. (See Sep. 4, 2007 Original Pet. Writ of Habeas Corpus, ECF No. 19; Nov. 2, 2007 First Am. Pet. Writ of Habeas Corpus, ECF No. 30; Feb. 14, 2008 Order Granting Mot. Stay Fed. Proceedings, ECF No. 45.) Upon return to this court, Mr. Taylor filed his Second Amended Petition (SAP).

[5] See SAP at i–xii.

Ms. Tiede and Ms. Potts.  All of this, he says, resulted in a plea that was not knowing or intelligent and that had no factual basis to support it.

As discussed below, the court finds that Mr. Taylor's constitutional right to effective assistance of counsel was violated when he pleaded guilty to two capital murders based on inexcusably uninformed advice from counsel which then exposed him to the possibility of execution.  The record shows there is a reasonable probability that, but for trial counsel's failure to investigate, Mr. Taylor would not have pleaded guilty to two capital murders and would have insisted on going to trial with evidence that Mr. Deli, not Mr. Taylor, caused the deaths of Kaye Tiede and Beth Potts.

## **PROCEDURAL BACKGROUND**

On December 24, 1990, after Mr. Taylor was arrested, the State of Utah brought ten criminal charges against Mr. Taylor, including kidnapping, arson, robbery, attempted murder, and murder in the first degree (capital murder) for the deaths of Ms. Tiede and Ms. Potts.  Mr. Deli was similarly charged.

At the time Mr. Taylor was charged, the elements of first degree murder were, in relevant part, as follows:

> Criminal homicide constitutes murder in the first degree if the actor intentionally or knowingly causes the death of another under any of the following circumstances: … (b) The homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed; [or] (d) The homicide was committed while the actor was engaged in the commission of, or an attempt to commit, … aggravated burglary, [or] burglary.

Utah Code Ann. § 76-5-202(1)(b), (1)(d) (West 1990) (emphasis added).  The State did not charge Mr. Taylor or Mr. Deli with liability as an accomplice to murder, which is a different

crime with different elements.[6]  (See Dec. 24, 1990 Information, contained in "Pleadings.pdf" at

pp. 4–9, "Appendix of Appellate Records and Other Penalty Phase Documents" (disk filed

conventionally; see ECF No. 398).)

**Guilty Plea and Penalty Phase Trial**

Summit County public defender Elliott Levine, who was paid a flat rate to represent

indigent defendants, was appointed to represent Mr. Taylor.  The State then held a preliminary

hearing on January 8, 1991, during which Linae Tiede and investigating officers testified.  At the

conclusion of the preliminary hearing, the matter was set for trial.

The guilt phase of Mr. Taylor's trial was initially scheduled for March 19, 1991.  That

trial date was continued to May 7, 1991.  But Mr. Taylor did not go to trial.  Instead, on May 1,

1991, six days before trial, he pleaded guilty to the two capital homicide charges in exchange for

dismissal of the lesser charges.  During plea negotiations, the State refused to take the possibility

of a death sentence off the table, so Mr. Taylor still faced a trial on the question of whether he

should be sentenced to death.  Two weeks later, on May 15, 1991, Mr. Taylor's penalty phase

trial began.

In the meantime, Mr. Deli had gone to trial on the same counts.  On May 14, 1991, the

day before Mr. Taylor's penalty phase trial started, a jury found Mr. Deli guilty of second-degree

murder.

During Mr. Taylor's penalty trial, the jury heard evidence from the State and Mr.

Taylor.  The State's evidence spanned two days and included Linae Tiede's testimony, ballistic

---

[6] The accomplice liability section of the Utah Code "requires conduct different from direct
commission of an offense before a defendant incurs accomplice liability."  D.B. v. State, 289
P.3d 459, 465 (Utah 2012).  At the time Mr. Taylor was charged, Utah Code provided that an
accomplice is one "who solicits, requests, commands, encourages, or intentionally aids another
person to engage in conduct which constitutes an offense[.]" Utah Code Ann. § 76-2-202 (West
1990).

evidence, crime scene evidence, and the medical examiner's findings.  Mr. Levine, on the other

hand, presented limited evidence consisting of the testimony of three witnesses, one of whom

was Mr. Levine's other capital client, James Holland.  His evidence presentation began and

ended on May 22, 1991, the same day the prosecution concluded its case.  And on that day, the

jury voted to impose a sentence of death.

**Direct Appeal**

Mr. Taylor appealed his sentence.  His new attorney, Bruce Savage, filed an appellate

brief asserting claims of ineffective assistance of trial counsel.  He then filed a motion under

Utah Rule of Appellate Procedure 23B seeking a hearing to develop evidence in support of those

claims.  Utah allows a "party to an appeal in a criminal case [to] move the court to remand the

case to the trial court for entry of findings of fact necessary for the appellate court's

determination of a claim of ineffective assistance of counsel."  Utah R. App. P. 23B(a).

On July 20, 1994, the Utah Supreme Court granted the request and remanded the matter

to the trial court, which held a Rule 23B hearing (the "23B Hearing") on the ineffective-

assistance-of-counsel claims.  The trial court issued findings of fact and concluded that Mr.

Levine's representation of Mr. Taylor was not ineffective.  (See June 9, 1995 Mem. Decision

23B Remand Hr'g (23B Decision), ECF No. 125-31.)

In its order, the trial court described the three theories Mr. Taylor raised:

Defendant's first theory is that Levine's personal philosophy as to the role of
defense counsel in a criminal case is at odds with the true role of defense counsel
and therefore results in a conflict of interest.  Secondly, Taylor asserts that
Levine's advice to him during the guilty plea process was in error and that he
relied upon that advice in entering his plea.  Lastly Taylor argues that Levine's
compensation from Summit County was so meager that Levine was not able to
devote the time and attention necessary to this case and that a conflict of interest
was thereby created between Levine's own personal interests and Taylor's
interests, and further that Levine failed to follow certain courses of action that

should have been followed if a reasonably professional defense had been provided Mr. Taylor.

(Id. at 4–5 (emphasis added).)

When discussing the claim about Mr. Levine's advice to Mr. Taylor during the guilty plea process, the 23B court limited its analysis to the claim that "Levine [incorrectly] advised [Mr. Taylor] prior to the entry of his guilty plea that in the penalty phase trial there would be no evidence relating to the charges that were to be dismissed." (Id. at 8.) The court found that Mr. Levine did not actually provide such advice, that Mr. Levine advised Mr. Taylor to go to trial, and that Mr. Taylor pled guilty against the advice of his attorney "primarily so as not to put Taylor's family and the victims through a guilty phase trial, and further Taylor did not want to 'snitch' on Deli." (Id. at 9.)

Although the 23B court concluded that Mr. Levine "was at all times prepared to go to trial and advised Taylor to go to trial," (id.), the court did not make any specific findings about Mr. Levine's level of readiness for trial. It did address evidence of Mr. Levine's "lack of investigation, failure to file motions, failure to interview witnesses, etc.," (id. at 10), but the court limited its discussion to the question of whether Mr. Levine's compensation hindered his ability to properly represent Mr. Taylor during the penalty phase. The court only briefly referred to Mr. Levine's actions during his representation of Mr. Taylor before Mr. Taylor pled guilty. (See id. at 15–16.) For the most part, the discussion concerned Mr. Levine's gathering and presentation of mitigation evidence, not evidence of guilt, and what prejudice, if any, Mr. Taylor suffered at the penalty phase. (See id. at 16 (noting Mr. Taylor's burden to show "a 'reasonable probability' that a different outcome at the penalty phase would have occurred had Levine done those things that Taylor claims he should have done.").)

Ultimately the court found that Mr. Taylor did not show by a preponderance of evidence that Mr. Levine's representation of Mr. Taylor at the penalty phase fell below "an objective standard of reasonable professional judgment," and it found that Mr. Taylor did not demonstrate that he was prejudiced by Mr. Levine's performance. (Id. at 10, 16–17.) The court cited, in particular, "overwhelming" evidence of Mr. Taylor's participation in the crime, which it described as "an eyewitness to the murders, eyewitnesses to the attempted murder of Rolph [sic] Tiede and the aggravated kidnapping, and [that] defendant was apprehended by a police officer as he fled the crime scene in the victims' vehicle, with hostages." (Id. at 16.) The 23B hearing did not, and was not designed to, develop or address evidence of Mr. Taylor's guilt.

After the trial court issued its findings, the matter went back to the Utah Supreme Court. On October 24, 1997, the Utah Supreme Court affirmed Mr. Taylor's conviction and sentence.[7] See State v. Taylor, 947 P.2d 681 (Utah 1997) ("Taylor I").

In Taylor I, the Utah Supreme Court addressed "whether Taylor's initial attorney, Levine, provided ineffective assistance of counsel and in doing so prejudiced the outcome" of the penalty trial. Id. at 684. The multiple grounds for that claim were those raised during the Rule 23B hearing as well as the ground that "the various errors by Levine resulted in cumulative error at the penalty phase[.]" Id. The court found that Taylor "failed to provide any evidence that if Levine had performed any of the suggested investigations, the outcome of the [penalty] trial would have differed. He does not even suggest what such investigation would have revealed and how the revelations would have improved his position with the jury." Id. at 685. The court characterized the issues as "misinformation about scope of penalty phase," "conflict in defense role," and "conflict of interest resulting from minimal compensation." Id. at 685–86, 688. The

---

[7] On October 5, 1998, the United States Supreme Court denied Mr. Taylor's Petition for Writ of Certiorari. Taylor v. Utah, 525 U.S. 833 (1998).

court expressed concern about Mr. Levine's "failure to pursue mitigation evidence." Id. at 686. But ultimately it found Mr. Levine's investigation, although "very limited," was "adequate." Id. at 687.[8]  As for the cumulative error analysis, the court found that Mr. Taylor "failed to identify deficiencies in Levine's performance that had any apparent effect on the outcome of his penalty trial." Id. at 688.

The court commented on evidence of the murders.  "We note that Taylor pled guilty to horrendous crimes and has never been able to suggest mitigating circumstances or undisclosed evidence which might have favorably influenced the jury.  Fairness requires the observation that Levine did not have a lot to work with in his defense effort." Id. at 688 (emphasis added). While it concluded that Mr. Levine's representation was not "ideal," it also noted that Mr. Taylor "was not the ideal defendant." Id. at 689.

> Taylor voluntarily pled guilty to committing heinous crimes without provocation, and the State had irrefutable, detailed evidence of those crimes.  The chances that Taylor would have fared any better had the best criminal defense attorney in the country made the perfect argument [to the penalty trial jury] are slim.  For this reason, Taylor cannot show prejudice related to Levine's performance.

Id. at 689–90 (emphasis added).

**First State Petition for Post-Conviction Relief**

On February 26, 1999, Mr. Taylor filed a habeas petition in state court under Utah's Post-Conviction Remedies Act (PCRA).[9]  Three years later, in 2002, Mr. Taylor filed his First Amended Petition for Post-Conviction Relief.

---

[8] In dissent, Justice Stewart disagreed with the majority's conclusion that the mitigation investigation was "'very limited' but 'adequate.'"  He concluded that Mr. Levine "did not conduct an in-depth investigation of defendant's psychological history and condition," that those factors "were simply not explored in any meaningful way," and that although nothing may have come from such an investigation, "it is not possible to know what might have been discovered had defense counsel done his job." Taylor I, 947 P.2d at 690 (Stewart, J., dissenting).

[9] Utah Code Ann. §§ 78B-9-101 to -405.

The centerpiece of his petition was a set of claims of ineffective assistance of trial and appellate counsel.  In those claims, he focused on numerous grounds for relief, but none addressed the questions of whether Mr. Levine investigated evidence relating to Mr. Taylor's culpability and whether Mr. Taylor's plea was knowing and intelligent.

The State filed a motion for summary judgment, contending that Mr. Taylor's claims concerning trial counsel's performance were procedurally barred because they were raised, or could have been raised, on appeal.  As for Mr. Taylor's assertion that his appellate counsel provided ineffective assistance by failing to raise certain issues on appeal, the State argued that Mr. Taylor "failed to show that any of [those issues presented] 'dead-bang' winning claims, i.e., they are obvious from the record and probably would have resulted in a reversal."  (Mar. 1, 2004 Mem. Decision at 4–5, Taylor v. Galetka, Case No. 990902315 (Third Judicial District Court for the State of Utah).)  The State district court granted the motion for summary judgment in March 2004.  (See id.)  That court agreed that all of Mr. Taylor's ineffective-assistance-of-trial-counsel claims were procedurally barred.  Then, applying the two-part standard articulated in Strickland v. Washington, 466 U.S. 668 (1984), the court found that Mr. Levine's performance was not deficient and that, in any event, Mr. Taylor was not prejudiced by Mr. Levine's performance.

On January 26, 2007, the Utah Supreme Court affirmed the denial of Mr. Taylor's PCRA petition.  See Taylor v. Utah, 156 P.3d 739 (Utah 2007) ("Taylor II").  But its findings did not track the reasoning of the trial court.

In particular, the court found that Mr. Levine's "performance was deficient because he failed to conduct an adequate mitigation investigation." Id. at 752.  Notably, the court did not address whether Mr. Levine conducted an adequate investigation related to a guilty phase trial, because that issue was not before it.

In its decision, the court noted that "[a]n attorney 'has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'"  Id. (quoting Strickland, 466 U.S. at 691).  Then, to determine whether Mr. Levine's mitigation "investigation fell within 'the wide range of reasonable professional assistance' in 1991," the court said

> we look to the information available to trial counsel.  We also consider the prevailing professional norms at the time.  In this case, we find evidence of the prevailing norms in [expert witness John Hill's] affidavit[10] as well as in the ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases (the ABA Guidelines).

Id. at 753.  Considering the standards, the court agreed that Mr. Levine was presented with enough information to justify an independent investigation to gather mitigation evidence and that his failure to undertake such an investigation under the circumstances "was inexcusable."  Id. at 755.  "[F]ailing to investigate because counsel does not think it will help does not constitute a strategic decision, 'but rather an abdication of advocacy.'"  Id. at 754 (quoting Harries v. Bell, 417 F.3d 631, 638 (6th Cir. 2005)).

Still, the Utah Supreme Court affirmed the lower court's decision because it found that Mr. Levine's deficient performance did not prejudice Mr. Taylor.  In other words, the court, applying the second prong of Strickland, found there was no reasonable probability that, but for Mr. Levine's professional error, the result would have been different.  The court considered the "totality of the evidence before" the sentencing jury.  Id. at 755.  "Given the horrendous circumstances of this crime, it is not at all likely that the jury would have concluded that the mitigating circumstances outweighed the aggravating circumstances."  Id. at 756.

---

[10] Mr. Hill was the director of the Salt Lake Legal Defender Association and testified at the 23B Hearing.

**Second State Petition for Post-Conviction Relief ("Exhaustion Petition")**

In September 2007, after the Utah Supreme Court denied his PCRA petition, Mr. Taylor filed his federal habeas petition with this court under 28 U.S.C. § 2254.  In November 2007, he asked this court to stay the matter so he could pursue his second post-conviction petition in State court.  (See Pet'r Mot. to Stay Fed. Habeas Action, ECF No. 32.)  He needed a ruling from the state court on claims that were raised in his federal petition but had not been presented to the state court.  This court granted his request and the matter was sent back to the Utah state courts so that Mr. Taylor could present unexhausted claims.  (See Feb. 14, 2008 Order Granting Mot. to Stay Fed. Proceedings, ECF No. 45.)

In his successive post-conviction petition to the state court ("Exhaustion Petition") he asserted thirty claims for relief, including the claim that his death sentence is disproportionate to his culpability in light of Mr. Deli's life sentence and in light of "newly discovered evidence suggest[ing] that the shots that killed Beth and Kay [sic] came from Deli's .44 caliber gun and not from Taylor's .38 caliber gun, and therefore Taylor is innocent."  Taylor v. State, 270 P.3d 471, 483 (Utah 2012) ("Taylor III").  In response, the State filed a motion to dismiss which the state district court granted in August 2009.  Mr. Taylor appealed the dismissal of twelve claims.

The Utah Supreme Court issued a January 2012 opinion (Taylor III) affirming the district court's ruling that all of Mr. Taylor's claims were procedurally barred under the PCRA and that no statutory or common law exceptions to the procedural bar allowed review of the claims' merits.  Responding to Mr. Taylor's claim that his sentence was disproportionate, the Utah Supreme Court expressed skepticism about Mr. Taylor's allegation that new evidence showed Mr. Deli killed Ms. Potts and Ms. Tiede:

> Taylor's argument does not meet the PCRA's requirement that the newly
> discovered evidence "demonstrate[] that no reasonable trier of fact could have

11

found the petitioner guilty of the offense or subject to the sentence received." Utah Code § 78-35a-104(1)(e)(iv).  Indeed, Taylor's argument is frivolous because there is ample evidence in the record to support Taylor's guilt.

Id. at 483 (alteration in original).  The court then described the "ample evidence":

Taylor admitted to Dr. Moench, a psychiatrist who examined him pursuant to a court order, that he was the shooter and had killed both victims. He also admitted to Dr. Moench that he emptied the .38 caliber gun into the victims and then grabbed the .44 caliber and also emptied that gun into the victims. Additionally, Linae testified that she heard Taylor say that he "had to shoot the bitch in the head twice." The medical examiner testified that the fatal wound to Kay [*sic*] was consistent with a .38 caliber and the other wound that could have been fatal was consistent with a .44 caliber. The medical examiner also testified that Beth had a .44 caliber wound to the head and a .38 caliber wound to the chest, both of which could have been fatal.

Id.  None of that evidence was tested by Mr. Levine.

The court also emphasized that Mr. Taylor pled guilty to the murders, and "that by pleading guilty, the defendant is deemed to have admitted all of the essential elements of the crime charged and thereby waives all nonjurisdictional defects….  A defendant can be spared from the consequences of his plea only if he can demonstrate that the plea was not made knowingly and voluntarily."  Id. (internal quotation marks and citation omitted).  The court then noted that "[b]ecause Taylor has not claimed that his plea was not entered knowingly and voluntarily, and because he was aware of Deli's sentence before he filed his first petition for post-conviction relief, this claim is procedurally barred."  Id.  Finally, although Mr. Taylor contended that "his assertion of factual innocence is good cause for [the court] to examine his claims," the court declined to address that issue because Mr. Taylor failed to appeal the district court's dismissal of his factual innocence claim.  Id. at 486 n.12.

Upon the Utah Supreme Court's denial of his Exhaustion Petition, Mr. Taylor returned to federal court.

12

**Federal Habeas Petition and Actual Innocence Claim**

At that point, Mr. Taylor's petition in this court was ripe for review.  After amending his petition for the second time, Mr. Taylor conducted discovery necessary to pursue his first claim, "Actual Innocence."  He then moved for an evidentiary hearing[11] to present evidence he had gathered during his investigation into the circumstances of the murders.  That evidence, Mr. Taylor argued, would show that the bullets he fired did not cause the deaths of Ms. Potts and Ms. Tiede.  In other words, he was "actually innocent" of the two capital murders to which he pled guilty because the evidence shows that the fatal shots came from the .44 magnum revolver fired by Mr. Deli.

Mr. Taylor requested that this court grant an evidentiary hearing on other claims as well. But the court focused only on the actual innocence claim, reasoning that a favorable ruling on that claim would moot the remaining claims.

In his motion, Mr. Taylor relied on the United States Supreme Court decision in Schlup v. Delo, 513 U.S. 298 (1995), which addressed a claim of "actual innocence."  The Schlup Court held that a petitioner's otherwise procedurally-defaulted claim may, under limited circumstances, be heard on the merits if it is based on a contention that the ineffectiveness of his counsel "denied him the full panoply of protections afforded to criminal defendants by the Constitution." Id. at 315.  Schlup allows the federal court to review the defaulted claim if it "falls within the 'narrow class of cases … implicating a fundamental miscarriage of justice.'"  Id. (quoting McCleskey v. Zant, 499 U.S. 467, 493–94 (1991)).  To satisfy this "gateway standard," a petitioner must present evidence that "it is more likely than not that no reasonable juror would

---

[11] See Pet'r's Mot. for Evidentiary Hr'g, ECF No. 217.

have found petitioner guilty beyond a reasonable doubt."  Id. at 322.  Mr. Taylor sought the chance to present his evidence of "actual innocence."

The State opposed the motion, arguing that Mr. Taylor had not met his burden under Schlup and that, in any event, Mr. Taylor was clearly guilty as an accomplice so he could not be "actually innocent."  The court rejected the State's accomplice liability argument.  Citing to Utah case law, the court reasoned that because Mr. Taylor was not charged with accomplice liability and did not plead guilty to accomplice liability, a denial of his motion on the basis of accomplice liability would contravene his due process rights.  (See Jan. 17, 2017 Order & Mem. Decision Granting Evidentiary Hr'g at 1, 20–24, ECF No. 264 ("Schlup Order").)[12]

The court granted Mr. Taylor's request for an evidentiary hearing to establish actual innocence.[13]  (See id. (finding that Mr. Taylor was entitled to an evidentiary hearing because he "established the potential to advance his claim of actual innocence").)

In March 2018, the court held a three-day evidentiary hearing (the Schlup Hearing), during which the parties presented ballistics and medical forensics evidence, along with supporting expert testimony.  Based on that evidence, the court, on February 25, 2019, held that

---

[12] The court notes that the Eighth Circuit Court of Appeals in Jones v. Delo rejected a similar argument, commenting on the nature of a petitioner who is "actually innocent":

> Although "[a] prototypical example of 'actual innocence' … is the case where the State has convicted the wrong person of the crime," [Sawyer v. Whitley, 505 U.S. 333, 340 (1992),] one is also actually innocent if the State has the "right" person but he is not guilty of the crime with which he is charged.  See Schlup, 513 U.S. at 321 (noting prisoner interest in relief "'if he is innocent of the charge for which he was incarcerated'") (quoting Kuhlmann v. Wilson, 477 U.S. 436, 452 (1986) (plurality opinion)).

Jones v. Delo, 56 F.3d 878, 883 (8th Cir. 1995).

[13] Although Mr. Taylor requested a hearing on other claims as well, the court deferred ruling on that portion of Mr. Taylor's motion because of the potentially dispositive nature of his actual-innocence claim.  (See Jan. 17, 2017 Order & Mem. Decision Granting Evidentiary Hr'g at 3, ECF No. 264.)

Mr. Taylor had satisfied his burden to show "actual innocence."

> Given the reliable physical evidence and the weight of the expert opinions, the
> court holds that no reasonable, properly instructed juror, viewing the record,
> would have concluded beyond a reasonable doubt that Mr. Taylor fired the fatal
> shots that caused the deaths of Beth Potts and Kaye Tiede. In other words, no
> reasonable juror, conscientiously following the appropriate instructions requiring
> proof beyond a reasonable doubt, would have voted to convict Mr. Taylor of the
> charges to which he pleaded, capital murder as a principal.
>
> For these reasons, the court concludes that Mr. Taylor is entitled to the gateway
> Schlup allows.

(Feb. 25, 2019 Findings of Fact & Conclusions of Law Re: Claim of Actual Innocence at 52–53,

ECF No. 399 (the "Actual Innocence Order").)

The court's ruling allows Mr. Taylor to obtain review of the merits of his otherwise

procedurally-defaulted claims.  Claim Four is one of the defaulted claims and focuses on Mr.

Taylor's guilty plea.  At a May 6, 2019 status conference, the parties agreed that the court should

limit its review of the SAP to Claim Four, which, if proven, provides the relief Mr. Taylor seeks.

(See May 6, 2019 Min. Entry, ECF No. 406.)  That is what the court addresses now.

## **CLAIM FOUR**

In the Second Amended Petition (SAP), Claim Four asserts that "Mr. Taylor's Guilty

Plea is Constitutionally Defective."  (SAP at 70.)  Mr. Taylor divides the claim into five

subparts:

> 4.A.   Prior to Mr. Taylor Entering a Guilty Plea to a Capital Crime, Trial
> Counsel Had Not Conducted the Investigation Necessary to Offer Him
> Any Reasonable Advice.
>
> 4.B.   Trial Counsel Was Not Qualified to Represent Mr. Taylor at His Capital
> Trial.
>
> 4.C.   Trial Counsel Wrongly Advised Mr. Taylor That Evidence of the
> Dismissed Charges Would Not Be Admitted in His Penalty Trial.
>
> 4.D.   Guilty Pleas May Be Invalidated.

15

4.E.     Mr. Taylor's Plea Colloquy Was Constitutionally Deficient.

(Id. at 70–85.)

Because Subparts 4A and 4D are sufficient reason to vacate Mr. Taylor's sentence, the court does not reach the merits of the remaining subparts of Claim Four or the other claims in the SAP.

## STANDARD OF REVIEW

Generally, habeas relief is available under 28 U.S.C. § 2254 (AEDPA), in two circumstances.  The court may grant a petition if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Alternatively, the habeas petitioner is entitled to relief if the state court ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Id. § 2254(d)(2).  These standards apply to claims that the state court decided on the merits.

Customarily, AEDPA bars review of procedurally-defaulted claims (that is, claims that were not decided on the merits).  Subparts 4A and 4D of Mr. Taylor's Claim Four were procedurally defaulted.  Under normal circumstances, Subparts 4A and 4D could not be a basis for granting Mr. Taylor's habeas petition.

But in the February 2019 Actual Innocence Order, this court held that Mr. Taylor is entitled to rely on the "fundamental miscarriage of justice" exception articulated in Schlup v. Delo, 513 U.S. at 314–15.  That procedural-gateway exception—also known as the "actual innocence" procedural gateway—allows Mr. Taylor to present Claim Four to this court on the merits.

> In the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims.  Yet a petition supported by a convincing Schlup gateway showing "raise[s] sufficient doubt about [the

petitioner's] guilt to undermine confidence in the result of the trial without the
assurance that that trial was untainted by constitutional error"; hence, "review of
the merits of the constitutional claims" is justified.

House v. Bell, 547 U.S. 518, 537 (2006) (quoting Schlup, 513 U.S. at 317) (emphasis added).

The court's "actual innocence" ruling complicates what would otherwise be a
straightforward application of the AEDPA standard of review.  That statutory standard, which
assumes the claim was not procedurally defaulted, is very deferential to the State court.  See 28
U.S.C. § 2254(d).  Also, normally the federal court may only consider evidence presented to the
State court.  See id. § 2254(e)(1) ("determination of a factual issue made by a State court shall be
presumed to be correct" and the petitioner must rebut "the presumption of correctness by clear
and convincing evidence"); Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (holding that "review
of a claim under § 2254(d)(1) is limited to the record that was before the state court that
adjudicated the claim on the merits").

But given the exceptional circumstances—that is, the court is in the unusual position of
reviewing the merits of a procedurally-defaulted claim—the court finds that, in lieu of AEDPA's
restrictive standard of review, a de novo standard of review (including consideration of record
evidence developed in state and federal court) applies because Mr. Taylor is entitled to rely on
the "miscarriage of justice" exception.

The court reaches this conclusion for two reasons.  To begin, the limited standard of
review set forth in § 2254(d) applies to "any claim that was adjudicated on the merits in State
court proceedings[.]"  By definition, the § 2254(d) standard of review does not apply to Subparts
4A and 4D of Mr. Taylor's Claim Four because those portions of the claim were not decided on
the merits.  See Taylor III at 483 ("Because Taylor has not claimed that his plea was not entered
knowingly or voluntarily, and because he was aware of Deli's sentence before he filed his first
petition for post-conviction relief, this claim is procedurally barred").  Second, fundamental

principles articulated in United States Supreme Court cases support use of the *de novo* standard

of review.  For example, in <u>McQuiggin v. Perkins</u>, the Court stated that "the miscarriage of

justice exception survived AEDPA's passage intact and <u>unrestricted</u>."  569 U.S. 383, 397 (2013)

(emphasis added) (finding the petitioner could overcome AEDPA's due diligence barrier to

consideration of an untimely petition because the petitioner asserted a credible claim of actual

innocence).  The <u>McQuiggin</u> court pointed to <u>House v. Bell</u>, 547 U.S. 518, 539 (2006).  "In

<u>House</u>, we rejected the analogous argument that AEDPA replaced the standard for actual-

innocence gateway claims prescribed in <u>Schlup</u> with a 'clear and convincing' evidence

requirement."  <u>Id.</u> at 397 n.1.  <u>House</u> held that the standard of review in AEDPA did not apply to

"a first federal habeas petition seeking consideration of defaulted claims based on a showing of

actual innocence."  <u>House</u>, 547 U.S. at 539.  <u>See also</u> <u>Holland v. Florida</u>, 560 U.S. 631, 646

(2010) (noting that "equitable principles have traditionally governed the substantive law of

habeas corpus," and that the Court would "not construe [AEDPA] to displace courts' traditional

equitable authority absent the clearest command") (internal citations and quotation marks

omitted).

For the above reasons, the court will apply the *de novo* standard and decide the legal

issues considering all record evidence, including evidence developed at the <u>Schlup</u> Hearing and

the 23B Hearing, without the restrictions imposed by AEDPA.

## **<u>FACTS</u>**

The facts central to this court's decision come from the 23B Hearing and the <u>Schlup</u>

Hearing.  The 23B facts concern Mr. Levine's failure to investigate, his uninformed assumption

that Mr. Taylor was guilty of both crimes, his advice to Mr. Taylor based on that uninformed

assumption, Mr. Taylor's understanding of the State's evidence based on discussions with Mr.

Levine, and Mr. Taylor's belief that he fired the shots that killed Ms. Tiede and Ms. Potts.  The

evidence presented during the <u>Schlup</u> Hearing focuses on the events relating to the murders

themselves.

**Evidence from the 23B Hearing**

During the 23B Hearing, both Mr. Taylor and Mr. Levine testified about events leading

up to the change of plea hearing.[14]

### Review of the Prosecutor's Case File

Mr. Levine testified that it was his "practice to take advantage of the County Attorney's

open-file policy."  (23B Hr'g Tr. Vol. 3 at 104.)[15]  "I was able to walk in there, take files and

say, 'I'll bring it back later.'"  (<u>Id.</u> at 133.)  He said he saw what was in the County's file.  (<u>Id.</u> at

133, 135.)  That file contained "police reports; police narratives; witness statements; autopsy

reports; investigative reports; police officer interviews; fire investigation reports; firearm, bullet,

and laboratory reports; search warrant affidavit and warrant; an evidence list; and other

miscellaneous items."  (23B Hearing Order ¶ 79, ECF No. 125-32.)

Mr. Levine shared the contents of the file with Mr. Taylor and his "investigative

paralegal" Robina Gillespie.  (23B Hr'g Tr. Vol. 3 at 135.)

### Failure to Hire an Investigator

Mr. Levine worked with Robina Gillespie (his then-girlfriend) on the case.  She testified

that she was appointed by Summit County to "assist Elliott Levine at trial." (23B Hr'g Tr. Vol. 7

at 17.)  She was appointed around April 19, 1991.  (<u>See id.</u> p. 22 lines 19-25, p. 23 line 1, p. 25

---

[14] Although much of the 23B Hearing focused on Mr. Levine's failure to conduct a mitigation investigation in preparation for the penalty phase, the hearing did elicit testimony about Mr. Levine's investigation before Mr. Taylor pled guilty.

[15] The seven volumes of the 23B Hearing transcripts were filed conventionally.  (<u>See</u> Notice of Conventional Filing, ECF No. 397 (referring to Appendix of Appellate Records and Other Penalty Phase Documents, ECF No. 398).)

lines 10-12.)  When Mr. Taylor's appellate attorney, Bruce Savage, referred to her as an

"investigator," she corrected him and said she was hired as a paralegal.  (Id. at 22.)  She did the

same later in her testimony:

> Q.      (BY MR. SAVAGE) In between the time of April 19th, … to the change
> of Mr. Taylor's plea [on May 1, 1991], Ms. Gillespie, would you tell me
> what individuals, as an investigator, you investigated?  What did you do,
> other than review the case file and read it…?
>
> A.      You keep referring to me as an investigator.  That was not my primary
> function.
>
> Q.      Okay. How about paralegal.  I'll use that phrase.  Is that the primary
> function?
>
> A.      Yes.

(Id. at 25; see also id. at 29 (she testified that she was not comfortable with the term

"investigator" and that "paralegal" work was the best description of her duties).)

To the extent investigation was part of her duties, what little investigation she did was not

meaningful.  Between the time she was appointed, on April 19, 1991, and Mr. Taylor's plea on

May 1, 1991, she talked to Mr. Levine, read the case file, talked to the County's investigator

Joseph Offret (a detective assigned to the case), and attended Edward Deli's trial.  She said "[t]he

file included all the police reports, the witness statements, [sic] I read all the paperwork Elliott

[Levine] had available in his office.  I had spoken with, probably, the investigators at Park City."

(Id. at 26.)  Ms. Gillespie met Mr. Taylor for the first time on the day he pled guilty.  (Id. at 28–

29.)

She could not recall gathering any other information.  Mr. Savage referred to the notes

Ms. Gillespie took before Mr. Taylor pleaded guilty and asked:

> Q.      Okay.  So in addition to speaking with Mr. Levine for two and a half hours
> on the 19th of April, reading the file on the 25th, the 26th, the 30th, you
> talked to Joe Offret, and nothing else; it that a fair summary of what you
> just said?
>
> A.      That's as much as I remember, yes.

(Id. at 27.)

Other than Ms. Gillespie, who for all intents and purposes was hired as a paralegal and whose investigative activities were minimal at best, Mr. Levine did not hire anyone to assist with the case.

**Lack of Expert Witnesses**

Mr. Levine was familiar with the need for experts and the method for obtaining them.  He testified that he had used experts in other cases for Summit County, including experts in arson, ballistics, psychiatry, and handwriting.  (23B Hr'g Tr. Vol. 3 at 71–72.)  He also said he had no financial limitation on his ability to hire experts.

> I always bragged to other attorneys about how good I had it in Summit County because my clients had the best advantage of all because if I wanted to, I could get any expert I wanted to.  I used to brag that I had an unlimited budget in Summit County. … It gave me a lot of room to do a lot of things that I … otherwise may have been restricted to.

(Id. at 108.)

Yet Mr. Levine did not arrange for any expert to review the evidence against Mr. Taylor. (23B Hr'g Tr. Vol. 1 at 179.)  At best, he "may have discussed the matter, informally, possibly" with one person:

> Q.    … Did you arrange to have anyone independent of the prosecutors, the witness, review any of this evidence?
>
> A.    I can't say for sure, but I may have discussed the matter, informally, possibly, with somebody who I had used in a prior case.
>
> Q.    Can you tell us who that is?
>
> A.    I believe his name was – I can't remember his last name.  I think his first name was Chuck or Charles, but at this time I can't recall his last name. But I had used him in a prior case.
>
> Q.    Did you seek from the Court remuneration for this individual?
>
> A.    No, because, to the best of my recollection, it was an informal type of discussion; maybe we went out to lunch or a phone call; just a very informal kind of discussion.

21

(Id. at 178–79.)

He did not use a ballistics expert, although he made a passing reference to a discussion

with his "gun expert, ballistics expert":

> Q.     Okay.  In terms then of any evidence, whatsoever, the actual – the shell
>        cartridges, the ballistics, the angles of trajectory, the autopsy report,
>        virtually anything having to do with evidence of the State, did you seek to
>        have any experts independently review that evidence?
>
> A.     Other than talking with my gun expert, ballistics expert, other than that, in
>        talking to the State's witnesses, other than that, nope.  I can't recall
>        offhand, but my best recollection would be no.

(Id. at 179–80.)  Even if he had "talked" with a "gun expert," he testified that he did not hire that

expert or seek any ballistic evidence.  (Id. at 178.)

During the 23B Hearing, when the parties were discussing Mr. Levine's preparation of

mitigation evidence, Mr. Levine expressed distaste for paid expert witnesses.  He was asked why

he did not consult with an expert if he knew he could hire one.  He responded by saying:

> I don't – because the way I handle criminal cases, I just don't go around talking to
> and hiring experts merely because they are going to align with my position.  In
> other words, "gun for hire"; is it that kind of expert? That's what I am referring to.
> … In my opinion, I don't think that's ethical.

(Id. at 181.)  He explained: "I'm of the belief in criminal defense law that if you look high and

low, far and wide, you can come up with a, quote/unquote, expert that will say whatever – that

will back up whatever theory you are trying to pursue."  (Id.)  Although the discussion at the 23B

Hearing focused on the need for expert witnesses to support Mr. Taylor's presentation during the

penalty phase, Mr. Levine's distaste for experts may have spilled over to his failure to hire

experts to evaluate and challenge the State's evidence of Mr. Taylor's guilt.

### Mr. Levine's Assessment of the State's Evidence

From the beginning, Mr. Levine took the State's evidence at face value and conveyed his

belief to Mr. Taylor that the State's case was essentially unassailable:

22

Q.      I assume, since you had other police reports and you had observed the
        preliminary hearing and Mr. Taylor had seen at least many of the police
        reports and other information from the County and had also sat through
        the preliminary hearing, that it was clear to both of you that would it [sic]
        be a difficult case or – let me ask it this way: How strong was your
        estimate of the State's case in January and February of 1991?

A.      Very, very strong.

Q.      Did you convey that to Mr. Taylor?

A.      Yes.

Q.      Did you discuss with him the eyewitness testimony?

A.      Yes, we discussed everything.  We discussed everything.

(23B Hr'g Tr. Vol. 2 at 185–86.)  Mr. Levine said "there was a lot of overwhelming physical

evidence…."  (23B Hr'g Tr. Vol. 7 at 49.)  None of that evidence was tested.

### Mr. Taylor's Decision to Plead Guilty

Still, Mr. Levine testified that he encouraged Mr. Taylor to go to trial and advised him

that he should not plead guilty. By his reasoning, conviction of the capital charges was a given

but Mr. Taylor had nothing to lose by requiring the State to present its case at the guilt phase.  He

offered his assessment of the situation, and the reason for his advice: "This is a capital homicide

case. His options are – worst option is death penalty.  As far as I was concerned, it was going to

trial.  You didn't have an option."  (23B Hr'g Tr. Vol. 1 at 102–03.)

Mr. Taylor decided to plead guilty based on evidence he heard during the State's

presentation at the non-adversary preliminary hearing, his review of the State's case file, and his

conversations with Mr. Levine.  Mr. Levine did nothing to dissuade Mr. Taylor from believing

that no other evidence existed and did not tell him that an independent expert analysis of the

State's evidence was available and might provide a defense to the charges filed.  That is because

Mr. Levine did not test the State's evidence by hiring an investigator or expert witnesses.  But a

review of the State's evidence by a qualified expert could have shown (and ultimately did show

during the <u>Schlup</u> Hearing) that the State's evidence raised material questions about whether Mr.

Taylor fired the bullets that killed Ms. Potts and Ms. Tiede.

Mr. Levine testified that when Mr. Taylor expressed his desire to plead guilty, Mr.

Levine was surprised.  According to Mr. Levine, Mr. Taylor decided to plead guilty because "he

didn't want to put his family and he didn't want to put himself through a trial.  … And he also

expressed a desire not to put the victims through the agony of trial."  (23B Hr'g Tr. Vol. 2 at

192.)  Mr. Levine testified that he "couldn't quite understand" Mr. Taylor's decision.  "I stressed

to him that even if he were to plead guilty, there's still a penalty phase that is the same as a trial.

In other words, I tried to dispel his notion that he would be saving anything."  (<u>Id.</u> at 193.)

In other words, Mr. Levine believed Mr. Taylor's reason for pleading guilty—to spare his

family and the Tiede family the "agony" of going through a trial—was nonsensical because his

family and the victims would still have to endure presentation of the evidence at the penalty

trial.[16]  While Mr. Levine's characterization of the situation was accurate, he made the mistake of

assuming the State's evidence was conclusive proof of guilt.

---

[16] During the 23B Hearing, Mr. Taylor denied telling Mr. Levine he wanted to spare his family
and the victims the "agony" of going through trial.

> Q.    Did you tell Mr. Levine that you refused to put your family through the trial?
> A.    No.
> Q.    Do you recall –
>        THE COURT: Did you tell him that that was the reason that you were willing to
>        plead guilty?
>        ...
>        THE WITNESS:  No, I did not.
>        …
> Q.    (BY MR. SAVAGE) Did you have concerns about having your family attend the
>        trial?
> A.    I didn't want them – I didn't want to put them through it, but I didn't tell Mr.
>        Levine that I would not put them through it.

(23B Hr'g Tr. Vol. 5 at 9.)  The 23B court did not believe Mr. Taylor.  But even if Mr. Taylor
did tell Mr. Levine he was pleading guilty to spare his family, such a statement does not change

His assessment of the case was illustrated by his answer to questions at the 23B Hearing about the plea negotiations.  Mr. Levine said "basically I had nothing to work with…."  (23B Hr'g Tr. Vol. 3 at 137.)  "I'm stuck with these certain facts, okay? I have a gentleman who desired to plead guilty.  He had – he admitted the crime."  (Id. at 100.)

Mr. Levine conveyed his view of the evidence to Mr. Taylor, which included the conclusion that Mr. Taylor had fired the bullets that killed both Ms. Tiede and Ms. Potts.  But Mr. Levine was uninformed about the strength and nature of the State's evidence.  His assessment of the case, which he expressed to Mr. Taylor, misled Mr. Taylor.  As a result, Mr. Taylor was uninformed when he decided to plead guilty.

**Evidence at the _Schlup_ Hearing**

On February 25, 2019, this court issued Findings of Fact and Conclusions of Law (ECF No. 399) following the Schlup Hearing (the "Actual Innocence Order").  As noted above, that order lifted the procedural bar to consideration of Mr. Taylor's defaulted claims, including Claim Four.  To lift that bar, the court had to, and did, conclude that "no reasonable, properly instructed juror, viewing the record, would have concluded beyond a reasonable doubt that Mr. Taylor fired the fatal shots that caused the deaths of Beth Potts and Kaye Tiede."  (Actual Innocence Order at 52.)

The court issued its findings of facts and conclusions of law based on a review and analysis of evidence—old and newly discovered—of the murders.  The court explained that "Mr. Taylor submitted new evidence that he only fired the .38 special, not the .44 magnum, and that the .38 special did not cause the fatal wounds of Ms. Tiede or Ms. Potts."  (Id. at 5.)

---

Mr. Taylor's belief that he was guilty of capital murder.  Only an investigation could have changed that understanding.

The court found that Mr. Deli held the .44 magnum throughout the shooting.  The court reached that conclusion not just on Mr. Deli's testimony at the hearing, but also on Linae Tiede's eyewitness statements and Detective Joseph Offret's conclusion that it would have been a physical impossibility for Mr. Taylor to have shot the women with the .44 magnum.  (See id. at 9–14.)

The court then addressed whether each woman's fatal wounds was caused by the .44 magnum rather than the .38 special.  The court found that the evidence strongly indicated that Ms. Tiede died from a .44 magnum bullet and that no reasonable juror could find beyond a reasonable doubt that Ms. Pott's fatal wounds were caused by a .38 special.  (Id. at 26, 43.)

Those conclusions were based on evidence from the scene (for example, the investigators' bullet analysis, photos of the cabin, and physical evidence gathered by investigators), the autopsy reports, and the testimony and analysis presented by forensics and ballistics experts (both of whom Mr. Levine could have hired).  The court also considered the 2007 declaration and 2014 deposition of the State's medical examiner, Dr. Sharon Schnittker.  In her sworn statements, Dr. Schnittker questioned and ultimately withdrew the conclusion she reached in 1991 that Ms. Tiede was killed by a .38 special bullet. (See id. at 38–39.)

The ballistics experts compared the significant destructive power of a .44 magnum to the less powerful .38 special.  (See id. at 19–20.)  The forensics experts analyzed the nature of the wounds and opined about the type of bullet that caused each wound.  (See id. at 20–51.)  Their testimony of course shed light on the ultimate question of whether the .44 magnum rather than the .38 special caused each woman's fatal wounds.  But it also highlighted significant problems with Dr. Schnittker's conclusion about the type of bullet that killed each woman.  If Mr. Levine had hired ballistics and forensics experts and an investigator, he likely would have gathered

evidence to undermine, or at least call into question, the State medical examiner's methodology and testimony about the cause of death.

For example, it would have discredited her theory that the .38 bullet recovered during Ms. Tiede's autopsy caused her fatal wound.  In fact, Dr. Schnittker, upon further reflection in 2007 and 2014, discounted the value of the discovery and location of that bullet, upon which she relied when determining that the .38 special caused Ms. Tiede's death.  (See id. at 23.) Additionally, the level of damage to the bullet, the significance of which was apparent to Mr. Taylor's ballistics expert from the Schlup Hearing, suggested it was not the bullet that caused the fatal wound.  (See, e.g., id. at 39-41.)

As for the cause of death of Beth Potts, the court said in its Actual Innocence Order that the

> uncertainty [about the size of the bullet that caused Ms. Potts' chest wound], coupled with Mr. Deli's testimony that he held the .44-caliber handgun throughout the shooting, creates reasonable doubt about Mr. Taylor's guilt.  While the evidence does not conclusively resolve the caliber of bullet that caused Gunshot Wound #2 [Ms. Potts' chest wound], a reasonable juror would not be able to find beyond a reasonable doubt that a .38 caliber bullet caused either of Ms. Potts' fatal wounds.

(Id. at 51.)  In sum, the State's evidence, when countered by Mr. Taylor's ballistics and forensics experts (which Mr. Levine could have hired to test the State's case), would not have been enough for any reasonable, properly instructed juror to find beyond a reasonable doubt that Mr. Taylor fired the bullet that caused Ms. Potts' death.

That evidence was sufficient to satisfy the demanding Schlup standard; it also serves as an example of the evidence—both information creating reasonable doubt and exculpatory information—that would have been available to Mr. Levine if he had investigated and tested the State's case.

## ANALYSIS

Claim Four of the SAP raises an ineffective-assistance-of-counsel claim under <u>Strickland</u> <u>v. Washington</u>, 466 U.S. 668 (1984).  Mr. Taylor asserts that Mr. Levine's ineffective assistance resulted in an unconstitutional guilty plea.  He argues that his plea was not knowing or intelligent because Mr. Levine "had not conducted the investigation necessary to offer any reasonable advice," and had "misled [him] by telling him that he was responsible for Kaye Tiede's death[.]" (Pet'r's Brief Regarding Claim Four at 3, ECF No. 408.)  Similarly, he contends that his plea was invalid because "there was an inadequate basis for [him] to plead guilty to the murders." (<u>Id.</u>)

To prevail on his ineffective-assistance-of-counsel claim, Mr. Taylor must satisfy the well-known two-part test articulated in <u>Strickland</u>.  <u>See</u> <u>Hill v. Lockhart</u>, 474 U.S. 52, 58–59 (1985) (holding that <u>Strickland</u> applies in the guilty plea context).  Under the first prong, Mr. Taylor must show that Mr. Levine's "performance fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 687.  The second prong requires Mr. Taylor to establish prejudice caused by the ineffective assistance.  "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." <u>Hill</u>, 474 U.S. at 59.

### 1.    **Mr. Levine's Performance**

<u>Strickland</u> requires Mr. Taylor to show that Mr. Levine "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687.  Review of Mr. Levine's performance must be highly deferential.  That imposes "a heavy burden" on Mr. Taylor to overcome the presumption that Mr. Levine provided "adequate assistance and made all significant decisions in the exercise of

reasonable professional judgment." Harmon v. Sharp, 936 F.3d 1044, 1058 (10th Cir. 2019) (internal citations and quotation marks omitted).

Taking a deferential view of counsel's performance, the court may find an attorney's performance is inadequate if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The Tenth Circuit characterizes this as conduct that was "'completely unreasonable, not merely wrong.'" Hooks v. Workman, 606 F.3d 715, 723 (10th Cir. 2010) (quoting Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999)). To makes this decision, the court must consider "prevailing professional norms" in place at the time of representation. Harmon, 936 F.3d at 1058.

According to Mr. Taylor, Mr. Levine provided sub-standard representation—that is, he did not meet the prevailing professional norms—because he "fail[ed] to conduct the investigation necessary to offer any reasonable advice, and [based] his advice on an incomplete and virtually non-existent investigation." (Pet'r's Brief Regarding Claim Four at 18, ECF No. 408.) "[T]he Sixth Amendment imposes on counsel a duty to investigate, because reasonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options." Strickland, 466 U.S. at 680. See also United States v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("[F]ailure to conduct any pretrial investigation generally constitutes a clear instance of ineffectiveness.") (emphasis added).

In death penalty cases, "prevailing professional norms" have been articulated in the American Bar Association (ABA) Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines). Harmon, 936 F.3d at 1058. The United States

Supreme Court recognized the advisory but still substantial role the ABA Guidelines play in a

Strickland analysis:

> The first prong—constitutional deficiency—is necessarily linked to the practice
> and expectations of the legal community: "The proper measure of attorney
> performance remains simply reasonableness under prevailing professional
> norms."  [Strickland, 466 U.S. at 688.]  We long have recognized that
> "[p]revailing norms of practice as reflected in American Bar Association
> standards and the like ... are guides to determining what is reasonable ...."  [Id.]
> Although they are "only guides," and not "inexorable commands," these standards
> may be valuable measures of the prevailing professional norms of effective
> representation[.]

Padilla v. Kentucky, 559 U.S. 356, 366–67 (2010) (multiple internal citations omitted).  See also

Harmon, 936 F.3d at 1059 ("'[T]o determine what is reasonable investigation, courts must look

first to the ABA guidelines, which serve as reference points for what is acceptable'"

performance) (quoting Wilson v. Sirmons, 536 F.3d 1064, 1084 (10th Cir. 2008)); Taylor II, 156

at 753 (analyzing Mr. Levine's competence in part based on the ABA Guidelines for

Appointment and Performance of Counsel in Death Penalty Cases).

At the time Mr. Levine was assigned to represent Mr. Taylor, the ABA had issued

advisory guidelines regarding the duty to investigate in a capital case.  (See ABA Guideline

11.4.1, 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty

Cases, attached as Ex. 109 to SAP, ECF No. 20-120.)  In the 1989 version, ABA Guideline

11.4.1 says that counsel for a capital defendant should conduct an independent investigation

relating to both the guilt/innocence phase and the penalty phase.  A legal expert who testified at

the 23B Hearing, John Hill, said "the ABA standards are very specific that you have a duty to

investigate, even if the defendant does not wish you to investigate…. [The ABA Guideline

concerning investigation] even outlines specifically the areas that you're required to investigate,

and what you're required to do."  (23B Hr'g Tr. Vol. 5 at 125.)

According to the Guidelines, capital counsel's investigation "should begin immediately upon counsel's entry into the case and should be pursued expeditiously." (ABA Guideline 11.4.1(A).)   ABA Guideline 11.4.1 also emphasizes that an investigation "should be conducted regardless of any admission or statement by the client concerning facts constituting guilt." (Id. 11.4.1(B).)  Sources of evidence to investigate include the charging documents, the defendant and potential witnesses, information in the possession of the police and prosecution, physical evidence, and the scene.  (Id. 11.4.1(D).)  And Guideline 11.4.1 stresses that counsel should seek out expert assistance where necessary and appropriate, including for "preparation of the defense; adequate understanding of the prosecution's case; rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial; [and] presentation of mitigation." (Id. 11.4.1(D)(7)(A)–(D).)

In particular, the commentary to Guideline 11.4.1 declared that "Counsel has a duty to investigate the case before recommending that a guilty plea be taken (or sought) or proceeding to trial.  This duty is intensified … by the unique nature of the death penalty and is broadened by the bifurcation of capital trials into two phases." (Commentary to ABA Guideline 11.4.1 (emphasis added).)  The Commentary further emphasized that

> Counsel's duty to investigate is not negated by the expressed desires of a client. Nor may counsel 'sit idly by, thinking that investigation would be futile.'  The attorney must first evaluate the potential avenues of action and then advise the client on the merits of each.  Without investigation, counsel's evaluation and advice amount to little more than a guess.

(Id. (emphasis added).)

Mr. Levine testified vaguely during the 23B Hearing that he consulted the ABA Guidelines.  (See 23B Hr'g Tr. Vol. 7 at 176.)  But he did not elaborate.  Later, in a 2013 declaration prepared for Mr. Taylor's federal habeas appeal, Mr. Levine declared that he could not "be sure that the manual [he] read was the guidelines and not another death penalty related

publication." (Apr. 18, 2013 Decl. of Elliott Levine ¶ 15, Ex. 130, attached to Reply to

Response to Second Am. Habeas Pet., ECF No. 139-1.) But even if he reviewed the ABA

Guidelines—and it does not appear that his review was more than cursory—he did not follow the

recommendations.

      At most, Mr. Levine reviewed the State's file, spoke with Mr. Taylor, and hired his

girlfriend Robina Gillespie, who considered herself to be primarily a paralegal and whose

activities were very limited in time and scope.[17] He did not visit the scene. He did not hire an

investigator. And, critically, he did not consult, much less hire, experts.[18] The ABA Guidelines

state that capital defense counsel should obtain experts at a minimum to adequately understand

the prosecution's case and, ultimately, to rebut that case. (See ABA Guideline 11.4.1(D)(7)(A)–

(D).)

      Mr. Levine had the ability to hire ballistics and other experts to investigate and support

Mr. Taylor's defense. During the 23B Hearing, he said he would brag to other attorneys that his

"clients had the best advantage" because he had "an unlimited budget" to "get any expert [he]

wanted" and that it gave him "a lot of room to do a lot of things" that would otherwise have been

restricted. (23B Hr'g Tr. Vol. 3 at 108.) Indeed, he had hired experts for other cases in Summit

---

[17] As noted above, over a period of eleven days, between April 19, 1991, and May 1, 1991 (the
date Mr. Taylor pled guilty), Ms. Gillespie talked to Mr. Levine, read the case file, talked to
Detective Offret, and observed Edward Deli's trial.

[18] The fact that he briefly spoke with a "gun expert, ballistics expert," does not qualify. (23B
Hr'g Tr. Vol. 1 at 179–80.) He testified that he did not "seek to utilize" a ballistics expert. (Id.
at 178.) Also, when asked whether he had "arrange[d] to have anyone independent of
prosecutors, the witness, review any of this evidence," he vaguely responded, "I can't say for
sure, but I may have discussed the matter, informally, possibly, with somebody who I had used
in a prior case." (Id. at 179.) He could not describe who that person was. "I believe his name
was – I can't remember his last name. I think his first name was Chuck or Charles, but at this
time I can't recall his last name." (Id.) The record does not contain written documentation of
any such visit, which Mr. Levine described as "lunch or a phone call; just a very informal kind of
discussion." (Id.)

County, including ballistics experts.  But he did not do so in Mr. Taylor's case.  More importantly, he did not provide any reason, strategic or otherwise, for deciding to forego the use of experts to analyze the strength of the State's case against his client.  See Strickland, 466 U.S. at 690–91 (whether an attorney has satisfied his duty to investigate is evaluated by focusing on "strategic choices" the attorney makes in light of all the circumstances).

If Mr. Levine had fulfilled his duty to investigate by, for example, hiring a ballistics expert and a forensics expert, he would have uncovered evidence that contradicted the State's evidence, and, as shown at the Schlup Hearing, exculpatory evidence.  The same can be said of the need to interview witnesses.  Detective Joseph Offret and Dr. Sharon Schnittker, the medical examiner, were key witnesses for the prosecution.  Yet both provided sworn declarations in 2007 in which they questioned the very evidence the State proffered to convict Mr. Taylor.  Additionally, in a 2014 deposition, Dr. Schnittker provided more specific testimony retreating from her 1991 conclusion that Ms. Tiede was killed by a .38 special bullet.

The United States Supreme Court's admonition that an attorney's strategic choices should be accorded great deference is tempered by the requirement that the attorney's decision about the need for, or the scope of, the investigation should be based on "informed legal choices … made only after investigation of options."  Id. at 680.  If a decision is "informed," a strategic choice may be respected if it is "based on professional judgment."  Id. at 681.

But Mr. Levine was not informed when he advised Mr. Taylor, and he made little to no effort to become informed.  There was no articulated, or conceivable, strategic reason for failing to hire an investigator and experts in a death penalty case.

"Effective representation hinges on adequate investigation and pre-trial preparation."  Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984).  Mr. Levine did neither.  "Though there

may be unusual cases when an attorney can make a rational decision that investigation is unnecessary, <u>as a general rule an attorney must investigate a case in order to provide minimally competent professional representation</u>." <u>Id.</u> (emphasis added) (internal citations omitted). Because Mr. Levine did not provide "minimally competent professional representation" when Mr. Taylor was deciding whether to plead guilty, Mr. Taylor was in essence unrepresented when he made the crucial decision to plead to two charges of first-degree murder. <u>See</u> <u>Taylor II</u>, 156 P.3d at 754 ("failing to investigate because counsel does not think it will help … [is] 'an abdication of advocacy'") (quoting <u>Harries v. Bell</u>, 417 F.3d 631, 638 (6th Cir. 2005)).

The State points out that Mr. Levine testified during the 23B Hearing that he advised Mr. Taylor to go to trial rather than plead guilty and that Mr. Taylor chose to plead guilty against his advice.[19]  Under the circumstances, this does not absolve Mr. Levine.

Mr. Levine did nothing to dissuade Mr. Taylor from believing that the bullets he fired had killed both women.  Rather, Mr. Levine conveyed his impression that the State's evidence, which he neither tested nor analyzed, overwhelmingly showed that Mr. Taylor was guilty.  (<u>See, e.g.</u>, 23B Hr'g Tr. Vol. 2 at 185–86, Vol. 7 at 49 (testifying that he believed the case against his client was "[v]ery, very strong," that "there was a lot of overwhelming physical evidence," and that he discussed that with Mr. Taylor).)

Mr. Taylor made his decision based on Mr. Levine's assessment of the case and, given that he thought a guilty verdict was a foregone conclusion, he decided to spare the victims and

---

[19] The court takes Mr. Levine's sworn testimony during the 23B Hearing at face value simply because it is his only contemporaneous explanation of the events leading up to Mr. Taylor's guilty plea.  Counsel for Mr. Taylor has questioned Mr. Levine's motives and the truthfulness of Mr. Levine's self-serving testimony.  Mr. Taylor also submitted an April 18, 2013 declaration from Mr. Levine, untested by cross-examination, shedding light on events and undermining some of Mr. Levine's 23B testimony.  (<u>See</u> Ex. 130 attached to Pet'r Reply to Resp. to Second Am. Habeas Petition, ECF No. 139-1.)  While the court recognizes the problems inherent in Mr. Levine's 23B testimony, the content of his testimony does not undermine Mr. Taylor's claim.

his family the distress a trial would cause.  Mr. Levine only advised Mr. Taylor to go to trial because Mr. Taylor's decision to protect his family and the victims would be futile; the same parade of evidence would occur regardless of whether the forum was a guilt-phase trial or a penalty-phase trial.  His advice to go to trial had nothing to do with whether Mr. Taylor would have a fighting chance during the guilt phase.  In other words, he did not advise Mr. Taylor to go to trial to test the substance of the State's case.

Because Mr. Levine did not investigate, he gave incorrect and misleading advice to Mr. Taylor based on his uninformed opinion that the evidence of Mr. Taylor's guilt was overwhelming.  He did not explain his failure to investigate during the 23B Hearing and nothing in the record supports a finding that his decision was based on strategic reasons under the circumstances.  An attorney may be accorded deference "to the extent [a] reasonable professional judgment[] support[s] the limitations on investigation."  Strickland, 466 U.S. at 691.  Here, there was no evidence that Mr. Levine made a strategic choice or otherwise exercised reasonable professional judgment.  Accordingly, Mr. Taylor has overcome the "strong presumption" that Mr. Levine's representation fell "within the wide range of reasonable professional assistance[.]" Id. at 689.

**2.      Prejudice to Mr. Taylor**

Under the Strickland prejudice prong, Mr. Taylor must show there is "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Hill v. Lockhart, 474 U.S. 52, 59 (1985).  The court finds he has shown prejudice.

Because Mr. Levine failed to investigate, he was not able to reasonably advise Mr. Taylor about whether or not to plead guilty.  "Without investigation, counsel's evaluation and advice amount to little more than a guess." (Commentary to ABA Guideline 11.4.1.)

Mr. Levine's flawed advice did not give Mr. Taylor a chance to intelligently weigh his options.  "The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'"  Hill, 474 U.S. at 56 (quoting North Carolina v. Alford, 400 U.S. 25, 31 (1970)). Mr. Taylor was not aware that if he pled guilty, he was foreclosing his chance to present strong evidence that he was not guilty and, as a result, avoid conviction and the penalty of death.  As the court found in the Actual Innocence Order, expert witness testimony and physical evidence from the Schlup Hearing support the conclusion that no reasonable juror would find beyond a reasonable doubt that Mr. Taylor killed Ms. Tiede and Ms. Potts.  If Mr. Levine had investigated the case and properly advised Mr. Taylor about the merits of the evidence against him, there is a reasonable probability that Mr. Taylor would not have pleaded guilty to the first-degree murder charges and instead would have insisted on going to trial.

In short, Mr. Taylor was prejudiced by Mr. Levine's completely unreasonable errors.

## CONCLUSION

Based on a review of the record and application of the standards in Strickland v. Washington, 466 U.S. 668 (1984), and Hill v. Lockhart, 474 U.S. 52 (1985), the court concludes that Mr. Taylor's guilty plea was unconstitutional and must be invalidated.

Mr. Taylor has satisfied the requirements of Strickland.  He has established that his attorney, Elliott Levine, provided him with deficient representation falling well below the prevailing professional norms.  Because Mr. Levine failed to conduct an investigation, he did not

36

have the information necessary to provide competent advice.  As a result, Mr. Taylor did not

make a knowing and intelligent decision to plead guilty to two capital crimes.  But for Mr.

Levine's uninformed advice and substandard representation, there is a reasonable probability that

Mr. Taylor would not have pled guilty and would have insisted on going to trial. And, as

demonstrated by the findings in the court's Actual Innocence Order, there is a reasonable

probability that the result of a guilt-phase trial would have been different because no reasonable

juror would have voted to convict him on the first-degree murder counts for which he was

charged.  Mr. Taylor was unquestionably prejudiced by his attorney's ineffective representation.

Because Mr. Taylor's death sentence was based on his invalid guilty plea, it must be

vacated.  Accordingly, the court grants Mr. Taylor's request for habeas relief under Claim Four.

## **ORDER**

For the reasons set forth above, the court GRANTS Von Lester Taylor's Second

Amended Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 (ECF No. 94).  Mr.

Taylor's guilty plea and death sentence are hereby vacated.

SO ORDERED this 10th day of March, 2020.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge